IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,      :

      :

      :      CRIMINAL INDICTMENT

v.      :      2:16-CR-009-RWS-JCF

      :      2:16-CR-010-RWS-JCF

HORACE MAYFIELD, et al.,      :

      :

      Defendants.      :

## **NON-FINAL REPORT AND RECOMMENDATION**

These cases are before the Court on several Defendants' motions to suppress evidence obtained as intercepted communications via wiretaps, filed by Defendants Horace Mayfield, Nathan Antonio Howard, Stephens Edwin Ivester, Quincey Jones, Leonardo Steeples, Thurston Chadwick Martin, Marvin Junior Teasley, and Avero Lacondo Howard in 2:16-CR-9 (Docs. 109, 113, 134, 135, 136, 143, 157, 162, 207, 208, 209, 210, 214, 227, 237, 271[1] in 2:16-CR-9) and Defendants

---

[1] Defendant Nathan Antonio Howard filed a "Motion To Suppress Wiretap Extension For Failure To File An Application And Affidavit Or Obtain An Order Authorizing Interception" purportedly on behalf of "ALL DEFENDANTS" (Doc. 271 in 2:16-CR-9 at 1), but Defendants Kevin Lesanne Stowers, Malissa Denice Holden, and Joy Yvette Hunter have not otherwise moved to suppress evidence based on the wiretaps at issue while the other Defendants have done so. Thus, it is not clear that Defendants Stowers, Holden, and Hunter have actually moved to suppress evidence obtained by the wiretap extension authorization at issue in Howard's motion. Nevertheless, the recommendations made in this report would

1

Mayfield, Ivester, Audreona Nyree Scott, Carlos Sanchez, Martin, and Mario Demitric Stowers in 2:16-CR-10 (Docs. 78, 85, 110, 111, 119, 127, 140, 167, and 187[2] in 2:16-CR-10) (collectively referred to as "wiretap motions").[3]

## Procedural Background

On March 16, 2016, the Government filed a 16-count Indictment in 2:16-CR-9 charging Defendants Horace Mayfield, Nathan Antonio Howard, Stephens Edwin Ivester, Quincey Jones, Leonardo Steeples, Thurston Chadwick Martin, Kevin Lesanne Stowers, Malissa Denice Holden, Marvin, Junior Teasley, Joy

apply with equal force to any such motions Stowers, Holden, and Hunter might have made.

[2] Defendant Horace Mayfield filed "Defendants' Joint Motion To Suppress Wiretap Extension For Failure To File An Application And Affidavit Or Obtain An Order Authorizing Interception" purportedly on behalf of "ALL DEFENDANTS" (Doc. 187 in 2:16-CR-10 at 1), but Defendants Gustavo Melendez and Wilfredo Otero have not otherwise moved to suppress evidence based on the wiretaps at issue as the other Defendants have done. It is therefore not clear that Defendants Melendez and Otero have actually moved to suppress evidence obtained by the wiretap extension authorization at issue in Howard's motion. Nevertheless, the recommendations made in this report would apply with equal force to any such motions Melendez and Otero might have made.

[3] The Court will issue a briefing schedule on other pending motions after the District Judge issues an order on the wiretap motions. (*See, e.g.*, Docs. 127, 129). The Court notes that some Defendants have filed motions to suppress evidence seized pursuant to searches of residences, in which they argue, among other things, that evidence should be suppressed as fruits of the poisonous tree because the evidence was obtained as a result of the allegedly unlawfully intercepted communications at issue in the wiretap motions. (*See* Docs. 141, 152). Because those Defendants have also advanced other reasons in support of suppression in those motions and they have not yet been fully briefed, the undersigned has not addressed them in this Report and Recommendation.

2

Yvette Hunter, and Avero Lacondo Howard with several drug-related offenses, including conspiracy to possess with intent to distribute cocaine.  (Doc. 1, 2:16-CR-9).  On the same date, the Government filed a 12-count Indictment in 2:16-CR-10, similarly charging Defendants Horace Mayfield, Stephens Edwin Ivester, Audreona Nyree Scott, Gustavo Melendez, Carlos Sanchez, Wilfredo Otero, Thurston Chadwick Martin, and Mario Demitric Stowers with drug-related offenses, including conspiracy to possession with intent to distribute methamphetamine.  (Doc. 1, 2:16-CR-10).

Defendants have filed several motions to suppress evidence obtained as a result of wiretaps of Defendants Mayfield's and Jones's telephones, authorized by Stephens County Superior Court Judge Russell W. Smith.  Defendants contend that evidence should be suppressed due to a number of violations of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2510 *et seq*., ("Title III"), "which regulates the interception of wire, oral, and electronic communications."  *United States v. Ojeda Rios*, 495 U.S. 257, 259 (1990).[4]

---

[4] In light of the number of motions and briefs filed in both cases and the multiple adoptions of motions and briefs within and between the cases, for ease of reference and judicial economy the undersigned refers to Defendants collectively in describing their arguments, regardless of whether each Defendant has actually a particular argument.  In addition, all references to docket entries are to filings in

The Court scheduled a hearing on Defendants' wiretap motions, and the Government moved to limit the scope of the hearing, requesting that the hearing be limited to Defendants' challenges to the wiretaps based on alleged violations of Title III's sealing requirements. (*See* Doc. 211). Defendants opposed that motion (*see* Docs. 215, 225, 231), but the Court granted it. (*See* June 28, 2016 minute entry Order). The Court held a hearing on June 29, 2016 and June 30, 2016 (*see* Docs. 235 & 236); *see also* Docs. 277 & 278 (Government's Exhibits); Doc. 279 (Defendants' Exhibits)), and transcripts of that hearing were filed on July 21, 2016 (Docs. 248, 249).[5]

After the hearing, Defendant Steeples filed a "Request For An Evidentiary Hearing And A Franks Hearing" (Doc. 260) in which he moved "to suppress the communications intercepted pursuant to the wiretapping orders because the supporting affidavits do not contain the required specific necessity or in the alternative to grant Defendants an evidentiary hearing on the issue of necessity." (Doc. 260 at 1). Defendant Sanchez filed a "Brief On The Necessity For An Evidentiary Hearing, in which he also argued that the wiretap affidavits did not

---

2:16-CR-9 unless otherwise indicated. Because the same arguments have been presented in multiple briefs, the undersigned has cited to representative briefs rather than endeavor to cite to each filing that contains that argument. Regardless of whether a specific brief has been cited, all briefs have been considered in evaluating Defendants' motions.

[5] References to those transcripts will be designated as "Tr. __."

satisfy the necessity requirement in 18 U.S.C. § 2518(1)(c).  (Doc. 175, 2:16-CR-10).  Defendant Martin adopted that brief.  (Doc. 263, 2:16-CR-9; Doc. 180, 2:16-CR-10).

On August 29, 2016, the Government filed its Reply to Motions to Suppress Wiretaps Related to Necessity, Probable Cause, Minimization and Jurisdiction (Doc. 265) and its Response to Defendants' Motions to Suppress Wiretap Evidence (Doc. 266).  Defendants filed a Joint Reply Brief In Support Of Motion To Suppress Wiretap For Improper Sealing (Doc. 270).  Defendants also filed a Motion To Suppress Wiretap Extension For Failure To File An Application And Affidavit Or Obtain An Order Authorizing Interception.  (Doc. 271).  The Government submitted a Reply to Defendants' Joint Reply Brief in Support of Motion to Suppress Wiretap for Improper Sealing (Doc. 274), and a Response to Defendants' Joint Motion to Suppress Wiretap Extension for Failure to File an Application and Affidavit or Obtain an Order Authorizing Interception (Doc. 275).  With briefing complete, the undersigned turns to the merits of Defendants' wiretap motions.

### Facts

These facts are taken from the testimony of Special Agent Clay Bridges with the Georgia Bureau of Investigation ("GBI"); Sergeant Mark Hodges of the

Georgia State Patrol, Michael A. Dull, the technical coordinator for the Atlanta-Carolinas High Intensity Drug Trafficking Area program ("HIDTA"), Special Agent Joseph V. Thompson with the Federal Bureau of Investigation ("FBI"), and Timothy D. Quick, the Clerk of Court for the Stephens County Superior Court. These facts are also taken from exhibits admitted during the June 29th and 30th hearing (*see* Docs. 277-1 through 277-15, Docs. 278-16 through 278-30 (Government's exhibits); Docs. 279-1 through 279-4 (Defendant's exhibits)) and exhibits attached to the parties' briefs.

Agent Bridges was the GBI case agent on the investigation of Defendants in these cases.  (Tr. 13).  In December 2015, he decided to seek state wiretap authorization for Defendant Mayfield's telephone, and he worked with Interim District Attorney Georgia Christian of the Mountain Judicial Circuit to obtain the authorization.  (Tr. 13-14).  The investigation of Defendants primarily centered in Toccoa, Georgia, in Stephens County, and the Mountain Judicial Circuit encompasses Rabun, Habersham, and Stephens counties in northeast Georgia.  (Tr. 14-15).  Bridges prepared the application for an investigative warrant authorizing the wire and electronic communications for target telephone number (706) 362-1023 (TT-1), primary user Horace D. Mayfield, III (Doc. 277-1).  (Tr. 15, 17). Bridges also prepared the affidavit in support (Doc. 277-2) and the order to be

6

presented to the judge (Doc. 277-3). (Tr. 15, 18). Bridges had worked on previous wiretap investigations, including surveillance and monitoring of the wiretaps, but he had never been an affiant for an application for a wiretap authorization and had never presented an application, affidavit, and order to a judge to obtain such authorization. (Tr. 16). In preparing the application and order, Agent Bridges reviewed previous wiretap authorization documents used by GBI agents that he obtained from Special Agent in Charge Mitchell Posey and Assistant Special Agent in Charge Ken Howard. (Tr. 15-16, 114-15). Those "go-bys" had been used in other investigations, presented to other district attorneys, and presented to and signed by other judges, but not by the judges Bridges appeared in front of in this case. (Tr. 16-17). Posey and Howard also gave Bridges materials from a course that Bridges reviewed, though "[t]here may be something that [he] skimmed through." (Tr. 103-05). Based on his review of the previous state wiretap investigations, he believed he had 10 days after the wiretaps ended to return the recordings for sealing. (Tr. 112-15).

District Attorney George Christian reviewed the documents Bridges drafted and edited them for grammatical and spelling errors, but he did not make any substantive changes. (Tr. 15, 17-19). Christian and Bridges then scheduled a meeting with Russell W. Smith, Chief Judge of the Superior Court of Stephens

County.  (Tr. 24-25).  Bridges was sworn in as the affiant for the affidavit, and Christian presented the application, affidavit, and Order to Judge Smith, who reviewed the application and affidavit and signed the order authorizing the wiretap of TT-1 on January 5, 2016.  (Tr. 15, 17-19, 24-27; Doc. 277-3).  The authorization order provides that all applications, affidavit, orders, reports, court reporter's notes, tapes, and disks, "and all other matters filed or received herein shall remain sealed until further Order of this Court."  (*See* Doc. 277-1 at 11).  The Order also provides, "Let return hereof and report as required by law be made before me within forty (40) days of date hereof or ten (10) days from the date of the last interception, whichever is earlier."  (Doc. 277-3 at 11).  The provisions about sealing and returns were included in each of the subsequent wiretap authorization orders at issue.  (*See* Doc. 277-8 at 11; Doc. 277-11 at 11; Doc. 277-14 at 11; Doc. 278-2 at 11).  Based on that language, Bridges understood he would have to return the wiretap and any evidence gathered from the wiretap orders 10 days following the last interception, and he understood that evidence would be sealed following the return.  (Tr. 62).

After Judge Smith signed the authorization order, Christian and Bridges took the original documents to the Clerk's Office, gave them to a clerk, and Christian told the clerk "that they were under seal."  (Tr. 27).  The application, affidavit, and

order also state in the caption, "**UNDERSEAL**."[6]  (*See* Doc. 277-1, 277-2, 277-3).

Bridges received a certified copy of the order and presented that order to HIDTA,

which controls the equipment that receives and records the wiretap transmissions.

(Tr. 28-29).  HIDTA then sent the order for TT-1 to the phone company to set up

the intercept, but the phone company sent the order back "because they did not like

some language within the order itself."  (Tr. 28).  The order said the number, i.e.

(706) 362-1023, was "subscribed to by and billed to Horace D. Mayfield, III," but

"in actuality, it was subscribed to by TracFone."  (Tr. 30).  Bridges drafted an

application for supplemental order to the originating order signed and presented by

District Attorney Christian to Judge Smith on January 6, 2015 (Doc. 277-4), and a

supplemental order that was signed by Judge Smith on January 6, 2015 (Doc. 277-

5). (Tr. 32-33).

     After Bridges received the supplemental order, he presented it to HIDTA to

be forwarded to the phone company, and the phone company then "switched on the

monitoring process."  (Tr. 34).  Law enforcement began monitoring Mayfield's

phone, TT-1, on January 7, 2016 at 12:40 p.m.  (Tr. 34).  The wiretap authorization

allowed them to monitor that line for 30 days from the date interception began.

(Tr. 34-35).  At some point Mayfield's number changed to (470) 266-9147, but

---

[6] The applications, affidavits, and orders for all of the wiretap authorizations at issue have that same designation in their caption.

Bridges was not required to obtain a new authorization order because the original order allowed law enforcement to monitor the line even if the number changed. (Tr. 36-37; *see also* Doc. 277-3 at 3).   As they approached the 30-day limit, Bridges took steps to obtain an extension of the wiretap authorization for TT-1. (Tr. 35).   He drafted an application (Doc. 277-6), an affidavit (Doc. 277-7), and an order authorizing the extension of the wiretap (Doc. 277-8).   (Tr. 35-41, 40-41). He relied on a previously used affidavit for an extension in drafting his affidavit, as well as the affidavit he prepared for the original wiretap of TT-1, and he also reviewed a previously used application and order in drafting the extension documents.   (Tr. 35-36).   He gave the extension documents to DA Christian to review.   (Tr. 36-37, 41, 121).   Other than corrections for grammar and spelling errors, Christian made no substantive corrections.   (Tr. 36).   The affidavit states in paragraph 21, "Judge Smith reviewed an affidavit that had established the probable cause necessary for the electronic intercept of Mayfield's cellular telephone.   This affidavit will be listed as Attachment #1 at the end of this affidavit."   (Doc. 277-7 ¶ 21).   In setting forth "Conventional Investigative Techniques," Bridges wrote, "See attached information listed within Attachment #1."   (Tr. 37-38; Doc. 277-7 ¶¶ 30-38).

Bridges and Christian presented the extension documents to Judge Smith on February 3, 2016.[7] (Tr. 39). On the first day of the hearing, Bridges testified that Attachment Number 1 was the original application, affidavit, and order for TT-1. (Tr. 38-39). He also testified that in presenting those documents, Attachment 1, i.e., the original application, affidavit, and order were binder-clipped together (not stapled because they were too thick), and then that packet was binder-clipped to the extension application, affidavit, and order. (Tr. 39-42). Bridges said that he gave Judge Smith Attachment 1 and explained that it was the order and affidavit presented to him in January. (Tr. 40, 42-43, 120-121). On the second day of the hearing, Bridges corrected his previous testimony and said that Attachment 1 to the extension affidavit was only his affidavit he presented in support of the original application for TT-1 (*see* Doc. 277-2), not the application and order as well (Tr. 243). Judge Smith reviewed the documents, including Attachment 1, and he signed the order authorizing the wiretap extension (Doc. 277-8). (Tr. 42-43, 121-123, 125, 170-71, 258).

After Judge Smith signed the extension order, Bridges went to the Clerk's Office in Stephens County and gave one of the clerks the wiretap authorization

---

[7] Bridges could not remember if they presented those documents to Judge Smith at the Rabun County Courthouse, the Stephens County Courthouse, or possibly in Athens when Judge Smith was attending a conference. (Tr. 120, 123-24, 244, 255-56, 263-64).

11

documents, i.e., the application, affidavit, and order.   (Tr. 123-27, 258-61). Although Bridges does not remember what happened when he gave the clerk the wiretap documents, he knows that he asked for and received a copy since he has a copy of those documents. (Tr. 262-63).  He also sent a copy of the extension order to HIDTA to be forwarded to the phone company.  (Tr. 44).  As discussed below, none of the extension documents presented at the hearing, i.e., the application (Doc. 277-6), Bridges' affidavit (Doc. 277-7), and the order (Doc. 277-8) were time-stamped by the Clerk's Office, and while the application and the affidavit are in a file in the Clerk's Office, Attachment 1 to Bridges' affidavit and Judge Smith's extension order are not in that file.[8]  (Tr. 323-29, 336-40).

During their investigation, Bridges discovered that Mayfield had a second line he was using, (678) 789-6513 (TT-2), so he prepared an application (Doc. 277-9), affidavit (Doc. 277-10), and order to obtain a wiretap authorization for that line (Doc. 277-11).  (Tr. 47, 51-52).  Again, Bridges used previous applications for wiretap authorizations, including the application he presented for Mayfield's other

_____

[8] Tim Quick, the Clerk of Court for Stephen County, testified that he placed all of the documents concerning the wiretap authorizations in envelopes, sealed them without looking at them, and kept those envelopes in his desk.  (Tr. 313-14, 332, 343-44). At some point a judge issued an order unsealing those documents, and they were available to be reviewed and copied by the public, including attorneys, in the Clerk's Office, though clerks do not watch while people review the files. (Tr. 312, 316-18, 333-35).

line, as "go-bys" in drafting these documents, and he presented his drafts to District Attorney Christian for review.   (Tr. 51-52).   Bridges and Christian presented the documents to Judge Smith, Bridges was placed under oath, and Judge Smith reviewed the documents and signed the order on January 21, 2016. (Tr. 52-53).  After Judge Smith signed the order, Bridges took the documents to the Clerk's office for filing and received a copy to send to HIDTA, which sent it to the phone company.  (Tr. 56).  They began recording conversations made over TT-2, although they were only able to receive about 10 percent of the calls because the line was "problematic."  (Tr. 57).

They also obtained authorization for wiretaps on two numbers for Defendant Quincey Jones.  (Tr. 57-58).   Bridges drafted an application for a warrant to intercept number (706) 244-9163 (TT-3) (Doc. 277-12), an affidavit in support of that application (Doc. 277-13), and an order authorizing the wiretap (Doc. 277-14). (Tr. 58-59).  Again, Bridges relied on previous applications as "go-bys," including the other applications he had prepared in this investigation.  (Tr. 59).  Bridges also drafted an application for a warrant to intercept number (706) 599-2611 (TT-4) (Doc. 277-15), an affidavit (Doc. 278-1), and an authorization order (Doc. 278-2). (Tr. 59-60).   District Attorney Christian reviewed these applications, affidavits, and orders, and then they presented them to Judge Smith on January 26, 2016.  (Tr.

13

59-61).   Agent Bridges was sworn and signed the affidavits, Judge Smith reviewed the documents, and then he signed the orders.   (Tr. 61).   They took those documents to the Clerk's office on January 26th.  (Tr. 62-63).   Bridges received certified copies to give to HIDTA to send to the service provider.  (Tr. 63).   They began monitoring Jones's lines on January 27, 2016. (Tr. 63).

At all times relevant to these cases, HIDTA was located on Juniper Street in Atlanta, Georgia.  (Tr. 223).   HIDTA occupied the entire building, and to get into the building, a person had to display law enforcement identification and had to either be let in by an employee or have a swipe or "prox" card to allow entry.  (Tr. 223-24).   As part of its operations, HIDTA has a wire room where technical equipment is located for assisting wiretap investigations, and it also has a server room.  (Tr. 224).   HIDTA uses a program called Voicebox to record conversations that are intercepted pursuant to wiretap authorization, and the conversations are recorded onto magneto optical discs or MODs on a Blu-ray in a publisher[9] in the rack inside the server room. (Tr. 132, 224).   There is also a second publisher that contains the working copy, which "stays in the system."  (Tr. 231).   HIDTA can create duplicate discs from the working copy.  (Tr. 231).   Access to the server room was restricted to Michael Dull, the Technical Coordinator for the Atlanta-

---

[9] The publisher "is a device that records everything on to the Blu-ray discs." (Tr. 229-30).

Carolinas HIDTA, Technical Coordinator Jim Maxwell, and Don Beck, an officer from Alpharetta assigned to HIDTA. (Tr. 221, 225). There are also two secured doors leading to the wire room. (Tr. 226). In order to access the server with the discs in it, a person would have to have an account in the system, a user name and password for Windows, and a user name and password for Voicebox. (Tr. 226). For the relevant period, only Dull, Maxwell, and Beck had user names that would allow them to access the server. (Tr. 227).

The GBI also set up a listening post in its office in Cleveland, Georgia to monitor the phone line. (Tr. 29). Agent Bridges, other agents in the Appalachian Regional Drug Task Force, and one or two agents with the FBI task force monitored the line. (Tr. 132). The monitors made notes and transcripts of the calls while they were being recorded. (Tr. 73) The monitors also typed in a synopsis of each call so they can "determine whether it is a pertinent call or not. (Tr. 74). The synopses were saved on a computer system maintained by HIDTA, and the agents were able to access that system. (Tr. 133). The original recordings were kept at HIDTA's Atlanta office, and to Bridges' knowledge, no one at the GBI's listing post had access to them. (Tr. 29-30).

The investigative team developed a plan for a takedown date of February 17, 2016 to execute approximately 15 to 20 search warrants and approximately 30

state arrest warrants.  (Tr. 64, 91).  On that date, they were still monitoring the four lines via the wiretap authorizations that had been issued.  (Tr. 67).  After the agents had taken Defendants Mayfield and Jones and their phones into custody, they stopped monitoring the four phone lines at approximately 11:30 a.m. to noon on the 17th.  (Tr. 67-68).  On that day, Agent Bridges assisted in the execution of a search warrant, conducted interviews, and tried to find Defendants who had not been arrested.  (Tr. 67-68).  Bridges' plan with respect to the returns for the four lines was to complete the returns "once we had developed discovery copies, once we have perfected the transcripts of certain calls, once we had perfected the synopses of certain calls and reviewed them."  (Tr. 68-69).  Bridges understood that the original recordings were at HIDTA, and that the agents could listen to the recordings from their listening post, make perfections on the transcripts or synopses and develop individual copies for the defendants to be presented in discovery.  (Tr. 69-70).  According to Bridges, his supervisor Special Agent in Charge Michael Posey, and his contact at HIDTA, Mike Dull, instructed him that once the originals had been removed from HIDTA, they could no longer perfect the transcriptions or make recordings of individual defendants to turn over in discovery.  (Tr. 70, 76, 91, 137-38).  Dull, on the other hand, testified that even after the originals had been removed, the agents can continue to log in to the

16

system and access a working copy of the recordings, and he denied that he has ever advised an agent that they could not continue to access the working copy once the original discs were removed.  (Tr. 232, 234-35).

On February 18th, Bridges assisted in organizing and documenting evidence that had been seized the day before.  (Tr. 70-72, 159).  The agents had not arrested all of the individuals for whom they had warrants, so Bridges also assisted in trying to locate them.  (Tr. 72).  He did not do any work with respect to the wiretap recordings on the 18th.  (Tr. 72).  On February 19th, he worked on transcripts of the recorded calls, "trying to perfect" them.  (Tr. 73).  They also made recordings and transcripts for each Defendant made up of each Defendant's calls.  (Tr. 74-75).  Based on Judge Smith's orders, Bridges believed he had 10 days to complete that work before the original recordings would be returned to Judge Smith and they would no longer have access to them.  (Tr. 76, 158).  Bridges did not intend to delay returning the original recordings to Judge Smith, he "was under the assumption that [he] had ten days to return them to him."  (Tr. 77).  It was also his intention to provide the prosecuting attorneys and defense counsel with individual defendant discs with the transcription and individual audio recordings.  (Tr. 77, 163-64).  Until Wednesday February 25th, the agents "divided individuals up; went back in and sat in and listened to phone calls and perfected transcriptions and

synopses," and made individual copies for the district attorney's office, and the U.S. Attorney's office. (Tr. 78-79, 92).

Sergeant Mark Hodges of the Georgia State Patrol, who is assigned to the Appalachian Regional Drug Enforcement Office, assisted Bridges in completing the transcripts. (Tr. 76, 193, 195). Hodges also understood the agents had 10 days to complete the work with the recordings and return the original recordings to Judge Smith because that is what Judge Smith's order said (Tr. 196, 200), and he had seen prior wiretap authorization orders and 10 days was "standard" (Tr. 205-06). The agents worked over the weekend, and then from Monday February 22nd until Wednesday February 24th, FBI Special Agent Joe Thompson (and to a lesser degree FBI Special Agent Mark Sewell) assisted them because they "were falling behind." (Tr. 76, 266-68, 290-91, 303). Agent Thompson also believed the agents had 10 days to make the returns based on Judge Smith's orders and his conversations with Agent Bridges. (Tr. 267). He also testified that Bridges and Hodges told him that per Mike Dull at HIDTA, they would lose the ability to assist in the review and perfection of the transcripts once the original discs were removed though they did not explain why. (Tr. 267-68, 296-97, 300).

In the meantime, the MODs or discs were kept in the publisher in HIDTA's server room, and the only people who could have accessed them were the three

people who had user names and passwords that would have allowed such access, i.e., Technical Coordinators Dull and Maxwell, and Officer Beck, and there was no ability for anyone to tamper with the recordings. (Tr. 227-29).

On February 25, 2016, Sgt. Hodges picked up four discs from HIDTA in Atlanta at approximately 9:25 a.m.,[10] signed an evidence receipt, and placed the discs in an envelope. (Tr. 79-80, 197-99, 216, 228-29; Doc. 278-3). He then drove to Cleveland and gave the discs to Agent Bridges. (Tr. 197-99). Bridges signed the evidence receipt, put them in an evidence bag, and put them in a locked weapons vault in his state-issued vehicle because it is tamper-proof. (Tr. 79-80, 82-83, 145-47, 197-99; Doc. 278-3). The vault has a cage around it and a combination lock, and the vehicle has an alarm system. (Tr. 83, 147).

After receiving the discs on February 25th, Bridges contacted the district attorney's office and scheduled a meeting with Judge Smith to present the returns the following day. (Tr. 82). On February 26th, Bridges went to the DA's office and met with Assistant District Attorney Ben Green, District Attorney Christian, and Judge Smith in Rabun County. (Tr. 84, 143, 149). Bridges "presented [the discs] to Judge Smith, explained that they were the original audio recordings from the wire," "that they must remain under seal; that they couldn't come back out of

---

[10] Dull logged into the system, paused the publisher, ejected the discs, and Hodges took possession of them. (Tr. 228-29).

seal," and "that [Bridges] would be sealing them in . . . a tamper-proof evidence bag." (Tr. 84-85, 149). Bridges sealed it the evidence bag, initialed it, and asked Judge Smith to initial the seal. (Tr. 85-86; Docs. 278-8, 278-9). Judge Smith instructed Bridges to take the recordings to the Clerk's Office where they should remain under seal. (Tr. 93, 151). Bridges did not believe that he needed a separate sealing order because the originating order directed that the recordings be sealed. (Tr. 87-88).

Agent Bridges also prepared returns for the investigative warrants for Judge Smith. (Tr. 81; Gov't Exs. 19 through 22). Bridges used "go-bys" for the returns, i.e., "[p]revious returns that had been utilized by . . . the GBI." (Tr. 81-82). District Attorney Christian also reviewed and signed the returns and Bridges and Christian presented them to Judge Smith on February 26th, and Judge Smith signed them. (Tr. 82, 92).

After Judge Smith initialed the evidence bag, Bridges immediately transported the recordings to the Stephens County Clerk of Court on February 26th. (Tr. 80, 90, 143-44). Bridges told the clerk that these were the original recordings, and "under the original order to seal the evidence" they were not to be unsealed. (Tr. 90, 144). The clerk took custody of the recordings and signed the evidence receipt. (Tr. 144; Doc. 278-3). Bridges has not had possession of the

recordings since that date.  (Tr. 90).  The Clerk of Court testified that he has kept the evidence bag with the discs in his desk, it has remained sealed, and to his knowledge it has never been opened.  (Tr. 343-44).

### Discussion

Defendants argue that evidence obtained as a result of the wiretaps at issue[11] should be suppressed on several grounds: (1) the affidavits in support of the wiretap authorization applications do not demonstrate probable cause for the issuance of the wiretap authorization orders; (2) the affidavits in support of the wiretap authorization applications do not demonstrate necessity for the wiretaps as required by 18 U.S.C. § 2518(1)(c); (3) the extension of the wiretap of TT-1 was not properly authorized; (4) agents failed to minimize interception of irrelevant communications; (5) the Government improperly copied and disseminated wiretap recordings; (6) the wiretap authorization orders improperly authorized out-of-state interception; (7) the original wiretap recordings have never been judicially sealed pursuant to a sealing order as required by 18 U.S.C. § 2518(8)(a); and (8) the original wiretap recordings were not submitted to the issuing judge to be sealed

---

[11] The wiretaps at issue are those authorized for: (1) Mayfield's phone number (706) 362-1023 (which was changed to (470) 266-9147) (TT-1), (2) the wiretap extension for TT-1 (3) Mayfield's phone number (678) 789-6513 (TT-2); (4) Jones's phone number (706) 244-9163 (TT-3); and (5) Jones's phone number (706) 599-2611 (TT-4).

immediately upon the expiration of the wiretap authorization orders as required by 18 U.S.C. § 2518(8)(a).

## I.   Statutory Framework For Wiretaps Under State And Federal Law

"Under Georgia law, wiretap orders may be issued 'upon written application, under oath, of the prosecuting attorney having jurisdiction over the prosecution of the crime under investigation, or the Attorney General, made before a judge of superior court,' and the wiretap must be consistent with 'Chapter 119 of Title 18 of the United States Code Annotated, as amended.' " *United States v. Cordero*, No. 1:11-cr-00009, 2011 U.S. Dist. LEXIS 157435, at *27 (N.D. Ga. Aug. 29, 2011) (quoting O.C.G.A. § 16-11-64(c)), *adopted by* 2011 U.S. Dist. LEXIS 151967 (N.D. Ga. Sept. 13, 2011).  "Chapter 119 of Title 18 of the United States Code addresses wiretaps in 18 U.S.C. § 2518, making Georgia's wiretap requirements co-extensive with federal law." *Id.*  Title III "sets forth numerous requirements the government must meet before electronic surveillance (wiretaps) may be authorized, including the requirements for a wiretap application, 18 U.S.C. § 2518(1), the findings the [issuing] court must make, 18 U.S.C. § 2518(3), and requirements for the . . . court's authorization order, 18 U.S.C. § 2518(4)." *United States v. Edwards*, No. 1:10-CR-521-07-TCB/AJB, 2012 U.S. Dist. LEXIS 23873, at *13 (N.D. Ga. Feb. 2, 2012), *adopted by* 2012 U.S. Dist. LEXIS 23715 (N.D.

22

Ga. Feb. 24, 2012).  Section 2518(10) provides that "[a]ny aggrieved person in any trial, hearing, or proceeding in or before any court . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to [18 U.S.C. § 2510 *et seq*.], or evidence derived therefore, on the grounds that—(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval."  18 U.S.C. § 2518(10).

## II.   **Probable Cause**

Defendants contend that probable cause did not support the issuance of the wiretap authorization orders.  (*See, e.g.*, Doc. 134 at 4-5; Doc. 135 at 5-6). "Section 2518(3) of Title III requires that a wiretap order be supported by probable cause to believe that (1) an individual is committing, or has committed, or is about to commit an offense enumerated in 18 U.S.C. § 2516, (2) that particular communications concerning that offense will be obtained through use of the wiretap, and (3) the telephone to be intercepted is being used in connection with the commission of such offense."  *United States v. Maldonado*, No. 1:12-CR-319-TCB-LTW, 2013 U.S. Dist. LEXIS 182720, at *49 (N.D. Ga. Dec. 20, 2013) (citing 18 U.S.C. § 2518(3)), *adopted by* 2014 U.S. Dist. LEXIS 1820 (N.D. Ga.

Jan. 8, 2014).  "[A]n application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant."  *Edwards*, 2012 U.S. Dist. LEXIS 23873, at \*14 (citing *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990) and *United States v. Gonzalez-Perez*, 283 Fed. Appx. 716, 721 (11th Cir. June 24, 2008)).  "The issuing judge is to make a 'practical, common-sense decision' about whether 'the totality of the circumstances' indicate that there is probable cause that the sought-for evidence will be obtained."  *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  "A reviewing court is 'simply to ensure that the [judge] had a "substantial basis for . . . conclud[ing]" that probable cause existed.' "  *Id.* (quoting *Gates*, 462 U.S. at 238-39).  "The practical nature of the issuing judge's decision justifies 'great deference' upon review and calls for upholding those findings even in marginal or doubtful cases."  *Id.* (citing *Nixon*, 918 F.2d at 900 and *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1992)).  "Like other types of warrants, probable cause must exist at the time surveillance is authorized."  *Id.* (citing *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985)).  "Moreover, 'the Government does not have a duty to establish probable cause as to the interception of calls involving each possible interceptee named in an application for a wiretap order; the Government need only establish that there was probable cause that the telephone in question is being used in an illegal

operation.' " *United States v. Jackson*, No. 3:14-CR-1 (CAR), 2015 U.S. Dist. LEXIS 61618, at *17 (M.D. Ga. May 12, 2015) (quoting *Domme*, 753 F.2d at 954).

Here, each affidavit provided probable cause to believe that Mayfield and Jones were engaged in drug trafficking offenses, that communications concerning those offenses would be obtained through the use of wiretaps, and that the telephones being intercepted, i.e. Mayfield's and Jones's phones, were being used in connection with the drug trafficking.  Specifically, the affidavits at issue show the following:[12]

### A.   TT-1

The affidavit states that in July 2015, a confidential informant ("CI 88-868") reported purchasing methamphetamine from Howard Mayfield two to three times a week for three to four months.  (Doc. 277-2 ¶¶ 21, 22).  The affidavit further describes a meeting between CI 88-868, who was equipped with a recording device, and Mayfield on July 13, 2015, under the surveillance of agents of the Appalachian Regional Drug Enforcement Office ("ARDEO").  (*Id.*).  During that meeting CI 88-868 and Mayfield discussed Mayfield selling drugs to the CI and

---

[12] The undersigned has addressed the alleged deficiencies with respect to the affidavit and authorization order for the wiretap extension of TT-1 in a separate section below.

other details about Mayfield's operation, i.e., how he "orchestrates his trips to Atlanta when he goes to reup (a term meaning to resupply)" in such a way to avoid arrest if he gets pulled over. (*Id.*). On Wednesday, CI 88-868 told GBI and ARDEO agents that Mayfield is a Stephens County methamphetamine trafficker, identified him in a photograph, explained how CI 88-868 met Mayfield, and identified William Gailey as a person from whom the CI had been purchasing methampthetamine since 2014 and who obtained his methamphetamine from Mayfield. (*Id.* ¶ 22). CI 88-868 reported that approximately four months prior, Mayfield began selling directly to the CI. (*Id.*). Typically the CI would pay Mayfield for a portion of methamphetamine "and be fronted a portion of methamphetamine," and then the CI would meet with Mayfield the next day to pay for the methamphetamine "received on consignment." (*Id.*). The CI also described where these transactions took place, and the vehicles Mayfield drove. (*Id.*). The CI further reported that the CI always contacted Mayfield on his cell phone number, 706-373-6674. (*Id.*). Shortly after CI 88-868's involvement in the investigation underlying these cases, he/she was arrested on methamphetamine trafficking charges and was incarcerated as of January 2016. (*Id.* ¶ 24).

On September 3, 2015, another confidential informant, "CI 88-896," who had been arrested earlier by the Habersham County Sheriff's Office, informed

ARDEO agents that the CI had purchased large quantities of methamphetamine, over 5 pounds, from Mayfield over a three-month period. (*Id.*). CI 88-896 reported that he/she had given Mayfield's cell number, i.e., 706-372-6674, to CI 88-868. (*Id.*). CI 88-896 described their transactions and where they occurred. (*Id.*). On September 9, 2015, CI 88-896 placed a controlled, recorded telephone call to Mayfield at 706-362-1023, a number the CI had obtained from a family member. (*Id.* ¶ 25). The CI told Mayfield that he/she knew "they were not on good terms," but the CI indicated that he/she "doesn't have a job right now [and] has to go back to doing what [he/she] knows how to do," and Mayfield responded, "well just give me a call." (*Id.*). On December 29, 2015, CI 88-896 told agents that he/she did not believe that Mayfield would provide the CI with more methamphetamine because the CI owed Mayfield $1,700 for methamphetamine, and because of "the manner in which things had been left between them, with the money owed and a heated argument between the two." (*Id.* ¶ 28). CI-88-896 placed a recorded call to Mayfield at 706-362-1023 and told him he/she "wanted to get an ounce and pay some money towards the debt that was owed "cause you know I still owe you that money," to which Mayfield responded "yeah." (*Id.*). Mayfield then said, "I don't fuck around anymore," and after the CI told Mayfield he could "call anytime because Mayfield knew what [the CI] was capable of

doing," Mayfield responded, "I respect that but my little business, my little landscape business is doing good right now and I don't need to put myself out there like that right now." (*Id.*).  According to Bridges' affidavit, that phone called "confirmed two things.  That Mayfield is still using his telephone number of 706-362-1023 and that CI 88-896 owes Mayfield a large sum of money for a significant quantity of methamphetamine received from Mayfield." (*Id.*).  The affidavit also indicates that although Mayfield referenced his "landscaping business," records indicate that he had been unemployed since 2002 and four months of surveillance showed him engaging in no landscaping activity and also showed that he lived well above his financial means, consistent with Bridges' belief that he was involved in methamphetamine trafficking.  (*Id.*).

Call detail records for 706-362-1023 for August 14, 2015 through September 29, 2015 (obtained through administrative subpoena) show that among other calls, there were 113 calls between Mayfield and Avero Howard of 317 Skyview Lane, Toccoa, Georgia, and CI 88-896 identified 317 Skyview Lane in Toccoa as being a location where the CI met Howard to purchase methamphetamine, and CI 88-868 identified a residence on "Sky View Road" in Toccoa as a place where he/she met Mayfield to purchase methamphetamine.  (*Id.* ¶¶ 22, 24, 30).  Those records also show hundreds of calls during that period with others of undetermined relationship

with Mayfield, including individuals with a history of drug offenses.  (*Id.*).  The affidavit also states that records for 706-362-1023 for October 1 through October 30, 2015 and November 1 through December 22, 2015 were similar to those from September, and based on Bridges' "training and experience . . . [he] expects the call patterns to continue," and he believed that these patterns, along with the other information included in the affidavit, suggest "that Mayfield's methamphetamine trafficking organization is of an ongoing nature."  (*Id.*).

The undersigned finds that Bridges' affidavit sufficiently set forth probable cause to believe that Mayfield was engaged in methamphetamine trafficking, that he used 706-362-1023 in that operation, and communications related to the trafficking would be obtained through wiretap surveillance of that number.

### B.    TT-2

In seeking authorization to wiretap TT-2, Bridges described information obtained through the wiretap of TT-1, initiated on January 7, 2016, as well as results of surveillance of Mayfield initiated on January 16, 2016.  That information shows that Mayfield communicated and met with others concerning the purchase of "cream" and "ice cream," terms which Bridges understands to be street lingo for methamphetamine, "three," which by context meant three ounces, and "half-

time."[13]   (Doc. 277-10 ¶ 26).   During the course of the surveillance, Mayfield

mentioned to a caller that a vehicle that was following him, and the caller said that

he was also being followed and intended to get a new telephone, "indicating to the

affiant that both were suspicious that they were under law enforcement

surveillance."   (*Id.*). On January 18, 2016, agents learned the Mayfield was in the

process of purchasing a new phone, and the next day they learned through wire

intercept of TT-1 that Mayfield was calling "known co-conspirators (Leonardo

Steeple and at least one as yet unidentified drug supplier)" and texting them a new

number.   (*Id.* ¶¶ 27-28).   Bridges asserted that based on his training and

experience, "drug dealers will often change phone numbers from which they

conduct business in order to avoid detection," and he indicated that Mayfield had

"changed his number once previously since the interception of this investigation."

(*Id.* ¶ 28).  Although Mayfield continued to use TT-1 and agents "continue[d] to

collect valuable, pertinent information concerning others involved in this ongoing

criminal enterprise, . . . conversations concerning the illegal drug trafficking ha[d]

---

[13] "Courts considering wiretap applications are allowed to rely upon the reasonable interpretations given by experienced law enforcement affiants as to the code, slang, or obtuse language used in conspiratorial communications."   *United States v. Najera-Perez*, No.1:12-CR-232-CAP-LTW, 2013 U.S. Dist. LEXIS 185792, at *11 n.2 (N.D. Ga. Nov. 15, 2013); *see also United States v. Flores*, No. 1:05-CR-558-WSD-JFK, 2007 U.S. Dist. LEXIS 103139, at *34 n.16 (N.D. Ga. Mar. 22, 2007) (same).

slowed considerably on this number." (*Id.* ¶ 29). Pursuant to administrative subpoenas issued January 20, 2016 to "known co-conspirators" Jones and Steeple, the agents learned that Mayfield's new number was (678) 789-6513. (*Id.* ¶ 30).

The undersigned finds that Bridges' affidavit sufficiently sets forth probable cause to believe that Mayfield was engaged in drug trafficking, and that he changed his phone number to (678) 789-6513 (TT-2) to avoid detection, that he used that number to continue to engage in drug trafficking, and that evidence of communications concerning that activity would be discovered through wiretap surveillance of that number.

### C.   **TT-3 and TT-4**

Both of these lines belonged to Defendant Quincey Jones, and the information provided by Bridges in his affidavits to support the wiretap authorizations for both numbers is similar. (*See* Doc. 277-13 and 278-1). Both recount the results of the authorized wiretap interceptions of conversations on TT-1 and TT-2 between Mayfield and Jones, using TT-3 and TT-4, which show that " [i]n the majority of these contacts, the nature of the calls were to conduct business concerning the illegal distribution of cocaine." (Doc. 277-13 ¶¶ 14-19; Doc. 278-1 ¶¶ 14-19). The undersigned finds that Agent Bridges set forth sufficient facts to establish probable cause to believe that Defendant Jones was involved in drug

31

trafficking activity with Mayfield and others, that he used TT-3 and TT-4 in discussing that activity with Mayfield, and that evidence of conversations concerning the drug trafficking would be obtained via wiretap surveillance of those numbers.

In summary, Bridges' affidavits establish probable cause to support the issuance of wiretap authorization orders for TT-1, TT-2, TT-3, and TT-4. Moreover, "the good faith exception to the exclusionary rule applies to considerations of wiretap warrants." *Edwards*, 2012 U.S. Dist. LEXIS 23873, at *17 (citing *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988)); *see also United States v. Lara*, 588 Fed. Appx. 935, 938 (11th Cir. 2014) (unpublished decision) ("Contrary to Lara's argument, the good faith exception can apply to wiretap evidence." (citing *Malekzadeh*, 855 F.2d at 1497)). Thus, "[e]ven were the undersigned to conclude . . . that there was no substantial basis for concluding that probable cause existed, the undersigned would nevertheless find that the good-faith exception applied." *Edwards*, 2012 U.S. Dist. LEXIS 23873, at *20.

"Pursuant to the good-faith exception, 'courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable

cause.' " *Edwards*, 2012 U.S. Dist. LEXIS 23873, at *20-21 (quoting *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984))).   In *Martin*, the Eleventh Circuit Court of Appeals explained what has become known as the *Leon* good faith exception to the exclusionary rule:

> [*Leon*] stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause.   The *Leon* good faith exception applies in all but four limited sets of circumstances.  *Id.* at 923.  The four sets of circumstances are as follows: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in" *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319[] (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Id.* (internal quotation marks omitted).

*Martin*, 297 F.3d at 1313 (original formatting altered).  The undersigned finds that none of those circumstances are applicable here.  Accordingly, even if probable cause did not support the issuance of the wiretap authorization orders in these cases, the *Leon* good faith exception to the exclusionary rule applies.  *See, e.g.*, *United States v. Degaule*, 797 F. Supp. 2d 1332, 1363 n.26 (N.D. Ga. 2011) ("Even

if the wiretaps were found to be invalid, suppression of the evidence seized is not warranted because the agents reasonably relied in good faith on the warrants."), *adopted by* 797 F. Supp. 2d 1332, 1344 (N.D. Ga. 2011); *United States v. Barnes*, 807 F. Supp. 2d 1154, 1249 (N.D. Ga. 2010) (finding that *Leon* good faith exception applied, and therefore "even if the wiretap orders . . . failed to meet the requirements of the Act, suppression of evidence obtained from the orders is not warranted"), *adopted by* 807 F. Supp. 2d 1154, 1168 (N.D. Ga. 2011).

It is therefore **RECOMMENDED** that Defendants' motions to suppress based on lack of probable cause to issue the wiretap authorization orders for TT-1, TT-2, TT-3, and TT-4 be **DENIED**.

## III.  <u>Necessity</u>

Defendants contend that the Government failed to prove the necessity of the wiretaps under 18 U.S.C. § 2518, and they request a hearing on this issue.  (*See* Doc. 109 at 9; Doc. 113 at 9; Doc. 134 at 2-3; Doc. 135 at 3-4; Doc. 162 at 9; Doc. 260; Doc. 263).  18 U.S.C. § 2518(1)(c) requires that each application for an order authorizing or approving a wiretap "shall include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  " 'Full and complete' means a description with specificity as to why

in this particular investigation ordinary means of investigation would fail or are too dangerous." *Barnes*, 807 F. Supp. 2d at 1238. "[T]he statute's 'full and complete statement' requirement does not mandate that officers include every single detail of an investigation, even if relevant to the need for a wiretap,' that is, '[p]rovided that sufficient facts are included supporting the need for a wiretap over other investigative procedures, the officer need not set forth the minutiae of an investigation[.]' " *Id.* (quoting *United States v. Cartagena*, 593 F.3d 104, 110 (1st Cir. 2010)).

18 U.S.C. § 2518(3)(c) provides that in order to authorize a wiretap, the issuing judge must "determine[] on the basis of the facts submitted by the applicant that [among other things] normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried to be too dangerous." In each order authorizing the wiretaps at issue, Judge Smith made that finding, i.e., he found that "[i]t has been shown and established that normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous." (*See, e.g.*, Doc. 277-3 at 2).

"This necessity requirement ensures 'wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the

crime,' but it does not require 'a comprehensive exhaustion of all possible investigative techniques.' " *United States v. Votrobek*, No. 14-12790, 2017 U.S. App. LEXIS 2506, at *17 (11th Cir. 2017) (quoting *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010)).  Instead, the government's wiretap application " 'must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.' " *United States v. Vinales*, 658 Fed. Appx. 511, 520 (11th Cir. 2016) (unpublished decision) (quoting *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986)).  "The statute does not seek to 'foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.' " *Id.* (quoting *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984)).  "The burden of establishing necessity is 'not great,' and [a reviewing court] must review the government's compliance with the necessity requirement in a 'practical and common-sense fashion.' " *Barnes*, 807 F. Supp. 2d at 1238-39 (quoting *United States v. Gray*, 410 F.3d 338, 343 (7th Cir. 2005)).  Moreover, a defendant "has the burden of overcoming the presumption of validity that attaches to the [issuing judge's] findings that the necessity provisions have been satisfied." *Id.* at 1239.

The undersigned has reviewed Agent Bridges' affidavits in support of the applications for wiretap authorizations[14] and finds that they sufficiently set out "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c).

### A.   Mayfield (TT-1 and TT-2)

As discussed above, the affidavits for the wiretaps for TT-1 and TT-2 describe information concerning Mayfield's alleged drug trafficking and his use of cell phones, i.e., TT-1 and TT-2, in connection with that activity.  Pertinent to the determination of whether necessity has been shown, the affidavits described investigative efforts that the agents had engaged in, including the use of CIs who had bought methamphetamine from Mayfield to meet with and/or call Mayfield; review of public records; surveillance of Mayfield; review of call records pursuant to administrative subpoenas of his phones; and with respect to TT-2, results of the wiretap surveillance of TT-1.  (*See* Docs. 277-2, 277-10).  The affidavits also include a section called "Need For Investigative Warrant" in which Bridges stated that "[b]ased upon the facts and circumstances outlined in this affidavit as well as

---

[14] The undersigned has addressed the alleged deficiencies with respect to the affidavit and authorization order for the wiretap extension of TT-1 in a separate section below.

your affiant's training and experience, it is [Bridges'] belief that the illegal drug operation of [Mayfield and others] has established a continuing pattern of criminal behavior which is facilitated through the use of telephonic communications"; that the investigative warrant "is the only available technique that has a reasonable likelihood of securing additional evidence necessary to prove beyond a reasonable doubt that [Mayfield] in concert with others is engaged in the above described offenses"; and that his "professional investigative training and experience . . . lead [him] to believe that routine law enforcement methods have been tried and failed or have proven to be impractical in this investigation and will not result in the successful arrest and prosecution of [Mayfield], culpable family members and other conspirators yet unknown." (Doc. 277-2 ¶ 31; Doc. 277-10 ¶ 32).

Bridges also included a section titled "Conventional Investigative Techniques," in which he described the limitations in using conventional investigative techniques in obtaining additional evidence concerning Mayfield's drug trafficking operation, including the identify of other participants, thus justifying electronic surveillance of his communications. (*See* Doc. 277-2 ¶¶ 32-38; Doc. 277-10 ¶¶ 32-38).

1.     **Confidential Informants and Cooperating Sources**

Bridges asserts that two CIs cooperated in the hopes of receiving consideration for their pending charges, but they "demonstrated to law enforcement officials that they would be fearful for their life and would most certainly be in a position of jeopardy if their involvement with law enforcement authorities became known to [Mayfield] or any of his associates," and they "would be reluctant to testify in any proceeding for fear of their safety," even if "immunized and provided protective custody." (Doc. 277-2 ¶ 32; Doc. 277-10 ¶ 32). These CIs were also not able to provide information as to the full identities of all members of the operation "or which would define the source of the narcotics used in any transactions, means of distribution, or identities of distributors, and "[c]onfidential informants normally have only limited information either furnished by a subject or learned second hand from others." (*Id.*).

2.     **Interviews Of Subjects Or Associates**

Based on his and other agents' experience, Bridges "believes that interviews would not be normally productive regarding this type of activity, because the only persons knowledgeable about the content of the conversations or transactions are the parties who are the direct participants and . . . also themselves subjects," and therefore "[i]nterviews of drug dealers and their customers are generally not

fruitful because of their own culpability" and "are not generally willing to testify in grand juries or criminal trials for the same reason." (*Id.* ¶ 33).

### 3.  Physical Surveillance

Bridges expressed his belief that "any attempt to establish physical surveillance of the Mayfield residence at 204 Mount Olive Way [in] Commerce . . . would prove unsuccessful due to the fact that [his] residence is situated such that stationary surveillance is not an option," and drive-by surveillance provides limited intelligence while increasing the likelihood of compromising the surveillance. (*Id.* ¶ 34).  While agents were able to conduct surveillance of Mayfield at various locations on multiple occasions, they were unable to determine the nature of his business at those locations or identify the persons with whom he was meeting. (*Id.*).  Moreover, frequent mobile surveillance of Mayfield provided limited intelligence and increased the likelihood that the surveillance would be compromised. (*Id.*).  While physical surveillance can be used to confirm meetings between alleged conspirators, but it often fails to disclose the purpose of the meeting.  (*Id.*).  Thus, Bridges asserts, "when physical surveillance is used in conjunction with electronic surveillance, the purpose of the meeting becomes significant and duly constitutes admissible evidence of the commission of the offenses discussed herein." (*Id.*).

40

### 4.   Call Detail Records

Bridges explains that although the agents were able to obtain call detail records for TT-1, "these records do not achieve the goals of the investigation" because they only show that contact was made between two phones but "do not identify those individuals actually making and receiving telephonic communications, nor can they ascertain the nature of these communications." (*Id.* ¶ 35).

### 5.   Pen Registers

A pen register was not used in this investigation, but like call detail records, "[a] pen register merely provides evidence that the telephone was used and that contact was made between two telephones," but it does not identify the participants or identify the content or substance of the calls. (*Id.* ¶ 36).

### 6.   Search Warrants

Bridges explained that while search warrants for Mayfield's residences may provide evidence to support the successful prosecution of Mayfield, . . . it has not yet been determined if Mayfield actually maintains illegal narcotics or evidence thereof at either address," and the investigation had shown the existence of unknown co-conspirators but "[s]earch warrants alone are not likely to provide

sufficient evidence to successfully prosecute these unknown co-conspirators." (*Id*. ¶ 37).

### 7.  <u>Undercover Agents</u>

One of the CIs is unable to introduce an undercover agent because he/she is incarcerated, and although the other CI is "still available," he/she has not been asked to introduce an undercover agent because it has been Agent Bridges' "experience that these subjects are extremely reluctant to conduct transactions with subjects with whom they are unfamiliar." (*Id.* ¶ 38).  Moreover, "[t]he relationship between Mayfield and the CI is currently strained due to outstanding debt," and "[a]n undercover agent introduction may further strain this relationship and/or place the safety of the CI and the agent in jeopardy." (*Id.*).  In addition, even if infiltration were possible, Bridges believed "they would likely only obtain evidence against subordinate conspirators." (*Id.*).

### B.  <u>Jones (TT-3 and TT-4)</u>

As discussed above, the affidavits for TT-3 and TT-4 contain information concerning the agents' investigation into Jones's involvement in drug trafficking with Mayfield and use of these phones to communicate with Mayfield about their operations. Similar to his affidavits for wiretaps of TT-1 and TT-2, Bridges included a section in the affidavits for TT-3 and TT-4 titled "Need For

Investigative Warrant" in which Bridges stated that "[b]ased upon the facts and circumstances outlined in this affidavit as well as your affiant's training and experience, it is [Bridges'] belief that the illegal drug operation of [Jones, Mayfield, and others] has established a continuing pattern of criminal behavior which is facilitated through the use of telephonic communications"; that the investigative warrant "is the only available technique that has a reasonable likelihood of securing additional evidence necessary to prove beyond a reasonable doubt that [Jones and Mayfield] in concert with others is engaged in the above described offenses"; and that his "professional investigative training and experience . . . lead [him] to believe that routine law enforcement methods have been tried and failed or have proven to be impractical in this investigation and will not result in the successful arrest and prosecution of [Jones, Mayfield], culpable family members and other conspirators yet unknown."  (Doc. 277-13 ¶ 21; Doc. 278-1 ¶21).

Bridges also included in each affidavit a section titled "Conventional Investigative Techniques," in which he described the limitations in using conventional investigative techniques—i.e., use of confidential informants and cooperating sources, interviews of subjects or associates, physical surveillance, call detail records, pen registers, search warrants, and undercover agents—in obtaining

additional evidence concerning Jones's involvement in drug trafficking, including the identify of other participants, thus justifying electronic surveillance of his communications.   (*See* Doc. 277-13 ¶¶ 22-28; Doc. 278-1 ¶¶ 32-38).   Bridges' representations concerning the limitations of using interviews of subjects or associates, call detail records, pen registers, and search warrants are similar if not identical to his representations made in support of the applications for TT-1 and TT-2.   (*Compare* Doc. 277-2 ¶¶ 33, 35, 36, 37 *with* Doc. 277-13 ¶¶ 23, 25, 26, 27). As to the use of confidential informants and cooperating sources, Bridges wrote that ARDEO agents attempted to identify or cultivate confidential informants or cooperating sources to attempt to infiltrate Jones's drug trafficking but were unsuccessful.   (*See* Doc. 277-13 ¶ 22).   Instead, "[t]he sole investigative technique that has identified Jones as a key co-conspirator within this criminal enterprise has been the Court ordered investigative warrant to monitor the cellular telephones of [Mayfield]."   (*Id.*).   Bridges also asserted that stationary surveillance of Jones's residence was "not an option," due to the way his residence was situated and "[d]rive-by surveillance provides limited intelligence and raises the likelihood of compromising the surveillance."   (*Id.* ¶ 24).   Bridges also outlined the limitations of mobile surveillance, similar to those described above with respect to TT-1 and TT-2 and described an incident during mobile surveillance of Mayfield on January

16, 2016 when Mayfield and an unknown person discussed the fact that they were being followed. (*Id.*). Finally as to the use of undercover agents, Bridges described the limitations with respect to the use of undercover agents as described in his affidavits for TT-1 and TT-2 set out above. (*Id.* ¶ 28). He also indicated that "on at least one occasion during this investigation, an individual working with the law enforcement spectrum has attempted to provide this organization with descriptions of undercover drug agents. The extent of this organization's community ties is extensive and not completely identified. This would put an undercover Agent in an unacceptable risk of danger." (*Id.*). Specifically, Bridges described a January 11, 2016 phone conversation between Jones and Mayfield during which they discussed talking to an employee of the Stephens County Detention Center, a nurse who, in another intercepted call "relayed information concerning the GBI undercovers in town." (*Id.* ¶ 17).

The undersigned finds that each affidavit discussed above, as a whole,[15] contains "a full and complete statement as to whether or not other investigative

---

[15] In evaluating whether the affidavits demonstrate necessity, the Court is not limited to reviewing the sections concerning conventional investigative techniques, but instead views the affidavit as a whole. *See, e.g.*, *United States v. Dooley*, No. 1:11-cr-00255-TWT-RGV, 2013 U.S. Dist. LEXIS 81225, at *57 (N.D. Ga. Jan. 30, 2013) (finding that "the affidavit, *as a* whole, alleges sufficient facts demonstrating necessity" (quoting *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990) (emphasis added)), *adopted by* 2013 U.S. Dist. LEXIS 80141 (N.D.

procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous" as required by 18 U.S.C. § 2518(1)(c). "In analyzing whether the Government has satisfied the necessity requirements, the court must consider the nature and scope of the investigation and the goals of the Government in that investigation." *United States v. Flores*, No. 1:05-CR-558-WSD-JFK, 2007 U.S. Dist. LEXIS 103139, at *46 (N.D. Ga. Mar. 22, 2007), *adopted by* 2007 U.S. Dist. LEXIS 72522 (N.D. Ga. Sept. 27, 2007).  Here, the wiretap applications asserted that the requested wiretap interceptions will permit the agents to: (1) identify the manner in which the participants "are committing the enumerated offenses and the extent of criminal activities of these persons"; (2) "to identify all unknown co-conspirators"; (3) to obtain sufficient evidence to insure the arrest and successful prosecution of all identified conspirators"; (4) to determine the sources, locations, and destinations of the drugs distributed by the alleged criminal enterprises; (5) to track the receipt and distribution of funds involved in these enterprises; (6) to discover the existence and location of records; (7) "to establish the administration, control, management, laundering and

---

Ga. June 7, 2013); *United States v. Murdock*, No. CR410-160, 2011 U.S. Dist. LEXIS 1303, at *6 (S.D. Ga. Jan. 6, 2011) (finding that the affidavit established necessity "because of the statements contained in the 'Alternative Investigative Techniques' portion of the affidavit, the background information provided therein, and the larger context of the affidavit *as a whole*" (emphasis added)).

disposition of proceeds of the drug distribution organization"; and (7) to determine the location and source of resources used to finance those activities. (*See, e.g.*, Doc. 277-1 at 3). "Accordingly, the effectiveness of traditional investigative techniques must be judged in light of the goals of the investigation and not based on whether one or more of the conspiracies' participants can be successfully prosecuted." *Flores*, 2007 U.S. Dist. LEXIS 103139, at *47. The affidavits explained why investigative techniques they had tried were inadequate to fully identify other participants of the drug trafficking operation, the extent of the operation, the source of drugs, and the nature and content of communications between suspected co-conspirators that would provide evidence of that conspiracy. Moreover, Bridges explains why the agents did not use other conventional investigative techniques, given the limitations of those techniques to provide additional information about the drug trafficking operations, including the limited usefulness in obtaining such information, the risk of discovery by the participants, and the risk of danger to confidential informants and/or undercover agents.

Defendants contend, however, that the affidavits rely substantially on "boilerplate" language taken from an affidavit in a previous wiretap investigation, and therefore "do not contain sufficient facts related to this specific case." (*See* Doc. 260 at 1-2; *see also* Doc. 263). The undersigned disagrees. In the first place,

the affidavits describe specific investigative techniques that the agents actually used, including review of call detail records, surveillance, attempts to use confidential informants, and the results of the wiretap surveillance of TT-1. Bridges explained why those techniques were limited in terms of identifying all of the persons involved in the drug operations and the specific nature and content of the communications between suspected co-conspirators.  It is true that Bridges included language concerning the limitations of other investigative techniques, which appears to be the same as language included in an affidavit drafted by GBI Agent Howard in connection with a wiretap investigation in Douglas County, Georgia (*compare* Doc. 260-8 ¶¶ 32-38 *with* Doc. 277-2 ¶¶ 32-38).  But "the 'fact that drug investigations suffer from common investigative problems' does not mean that an agent's assertions regarding necessity are boilerplate." *United States v. Cook*, No. 1:11-CR-218-TWT-CCH, 2011 U.S. Dist. LEXIS 154849, at *15 (N.D. Ga. Nov. 22, 2011) (quoting *United States v. Milton*, 153 F.3d 891, 895 (8th Cir. 1998)), *adopted by* 2012 U.S. Dist. LEXIS 57117 (N.D. Ga. Apr. 23, 2012); *see also United States v. Dooley*, No. 1:11-cr-00255-TWT-RGV, 2013 U.S. Dist. LEXIS 81225, at *55-56 (N.D. Ga. Jan. 30, 2013) (noting that some of the conclusions in the affidavits concerning other investigative techniques "could certainly apply to other investigations," but explaining that "an affidavit meets the

necessity requirement despite the presence of commonly-employed language as long as it is 'sufficiently specific and do[es] not constitute "boiler-plate" rationales' " (quoting *Degaule*, 797 F. Supp. 2d at 1359). "Thus, those assertions of need in the application in this case that are not unique to this drug case must be considered in judging whether the facts submitted to [the issuing judge] were sufficient to show that a wiretap order should issue because 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous' as required by 18 U.S.C. § 2518(3)(c)." *Cook*, 2011 U.S. Dist. LEXIS 154849, at *15-16.

Nor have Defendants shown that the "boilerplate" statements are untrue or do not apply to the circumstances of these cases. *See, e.g.*, *Edwards*, 2012 U.S. Dist. LEXIS 23873, at *18 (noting that the defendant's "assertion that much of the language in the affidavit is copy-pasted from earlier affidavits . . . is not an attack on [the] accuracy of the statements themselves"). For example, while Bridges' discussion of the limitations of call detail records and pen registers is identical to the language in Agent Howard's affidavit, Defendants have not shown those limitations to be inaccurate, i.e., that information obtained from such techniques does not disclose the identity of the participants of the phone calls or the nature and content of their communications. Nor have Defendants countered the specific

information Bridges including concerning difficulties with the use of confidential informants, undercover agents, and surveillance particular to these cases. That information included both informants' stated reluctance to testify due to fear for their safety and their inability to provide information about the identities of all conspirators or the source of drugs, means of distribution, or identity of distributors; one informant's strained relationship with Mayfield; one informant's lack of availability due to incarceration; evidence that Mayfield was aware of being followed during mobile surveillance, and the limited information obtained by attempting surveillance; difficulties introducing undercover agents into the operation due to the lack of informants to make those introductions; evidence that Mayfield and others suspected law enforcement surveillance of them; and evidence that a nurse at the county detention center was providing information to the subjects about GBI undercover agents. "Given these specific statements, the fact that some of the reasons that traditional investigative techniques would not work may apply to other investigations, 'will not negate a finding of necessity [because] the affidavit, as a whole, alleges sufficient facts demonstrating necessity.' " *Dooley*, 2013 U.S. Dist. LEXIS 81225, at *57 (quoting *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990)).

Defendants also contend that the Government failed to show "that normal investigative procedures were ever attempted and failed or were unlikely to succeed or were too dangerous as to any of the new individuals," i.e., "any of the named interceptees other than Mayfield." (*See, e.g.*, Doc. 263 at 7). That contention is misplaced. " '[T]he necessity requirement is directed to the objective of the investigation as a whole, and not to any particular person,' and '[i]f the [g]overnment can demonstrate that ordinary investigative techniques would not disclose information covering the scope of the drug trafficking enterprise under investigation, then it has established the necessity for the wiretap.' " *Degaule*, 797 F. Supp. 2d at 1360 n.22 (quoting *United States v. Reed*, 575 F.3d 900, 911 (9th Cir. 2009)); *see also Barnes*, 807 F. Supp. 2d at 1245 (declining to adopt "the very narrow focus espoused" in cases cited by the defendant "that for each and every wire intercept order for a member of a complex conspiracy a separate and detailed recitation of the attempt to use traditional investigative techniques aimed at that target must be included" because "[t]his narrow focus ignores the prevailing view, including in the Ninth Circuit, that 'the government is entitled to more leeway in its investigative methods when it pursues a conspiracy,' [*United States v.*]*McGuire*, 307 F.3d [1192,] 1198 [(9th Cir. 2002)], and that 'wiretaps are necessary tools of law enforcement, . . . particularly where crimes are committed by large and

sophisticated organizations,' [*United States v.*]*Wilson*, 484 F.3d [267,] 281 [(4th Cir. 2007)]").

The undersigned finds that the affidavits sufficiently described what investigative techniques had been tried, why there were not completely successful in meeting the goals of the investigation, and why Bridges believed that other conventional techniques would not succeed or be too dangerous.  Thus, Defendants have not met their "burden of overcoming the presumption of validity that attaches to [Judge Smith's] findings that the necessity provisions have been satisfied." *Barnes*, 807 F. Supp. 2d at 1239.  Moreover, even if the above-described affidavits did not sufficiently establish necessity, the good faith exception to the exclusionary rule applies as none of the circumstances set forth in *Leon* have been shown here. *See, e.g.*, *Barnes*, 807 F. Supp. 2d at 1248 (observing that "the good faith exception to the exclusionary rule applies to wiretap applications and orders," citing *Malekzadeh*, 855 F.2d at 1497, and therefore "even if the affidavits are lacking in establishing necessity, the exclusionary rule should not be applied in this case").

Accordingly, it is **RECOMMENDED** that Defendants' motions to suppress based on the lack of necessity for wiretap authorizations for TT-1, TT-2, TT-3, and TT-4 be **DENIED** without a hearing.[16]

## IV.   Wiretap Extension For TT-1

Defendants contend that the affidavit for the application for the extension of the TT-1 wiretap fail to establish probable cause and necessity and failed to show that the original wiretap "failed to produce the expected results" as required by 18 U.S.C. § 2518(1)(f).  (*See, e.g.*, Doc. 134 at 2-5; Doc. 135 at 3-6; Doc. 260 at 9-11; Doc. 263 at 6-10).  Defendants also argue that any evidence obtained pursuant to the wiretap extension should be suppressed because the application, affidavit in

---

[16] Defendants request a hearing on the issue of necessity (*see, e.g.*, Docs. 260, 263), but they have not shown that a hearing is required for the Court to determine whether the affidavits sufficiently demonstrate necessity.  Defendants also request a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978) (*see* Doc. 260 at 13).  "Entitlement to a Franks hearing requires a defendant to make a substantial preliminary showing establishing that the affiant deliberately or recklessly included a false statement or failed to include material information, in the warrant affidavit."  *Maldonado*, 2013 U.S. Dist. LEXIS 182720, at *60 (citing *Franks*, 438 U.S. at 155-56).  Defendants have not made that showing in these cases.  *See, e.g.*, *id*. at *61 (rejecting defendant's contention "that he is entitled to a Franks hearing to determine the full extent of information gathered from the cooperation of confidential sources and for the Government to show how it exhausted the conventional means of investigation available to them before seeking a wiretap" because the defendant had not "made any preliminary showing that SA deliberately or recklessly included a false statement in her affidavit or that she omitted material information from her affidavit").

53

support of the application, and the order authorizing the extension were not filed. (*See, e.g.*, Doc. 260 at 11-12; Doc. 271).

### A.   <u>Failure To File Wiretap Extension Order</u>

Defendants argue that because the order authorizing the wiretap extension was not filed, the order was not effective and did not authorize the continued wiretap of TT-1.  (Doc. 271 at 11-13).

The record shows that on February 3, 2016, Judge Smith signed an application for the wiretap extension for TT-1 (also signed by DA Christian) (*see* Doc. 277-6); he signed Bridges' affidavit submitted in support of that extension (*see* Doc. 277-7); and he signed an order authorizing the extension, presented by District Attorney Christian as shown by his signature (*see* Doc. 277-8).  None of those documents have a Clerk's Office timestamp.  Tim Quick, the Stephens County Clerk of Court, testified that when documents are brought to the Clerk's Office for filing, either the attorney or the clerk timestamps the documents.  (Tr. 306-07).  Although he testified that any pleading that is properly filed will have a timestamp (Tr. 307), when asked whether the above-referenced documents without timestamps were properly filed, Quick simply responded, "I don't know how that was filed. But we do timestamp everything that comes in, yes, sir."  (Tr. 308). According to Quick, the file maintained by the Clerk's Office contains the

application and affidavit for the TT-1 extension, but the file does not contain Judge Smith's extension order or Attachment 1 to Bridges' affidavit.[17] (*See* Tr. 323-29, 336-40). Agent Bridges testified that after Judge Smith signed the Order, he took the wiretap extension documents to the Clerk's Office in Stephens County and gave them to a clerk, and although he does not know what the clerk did with the documents, he is confident that he gave the documents to the clerk because he requested and received a copy of them. (Tr. 123-27, 258-63). Although Bridges' recollection of events concerning his and DA Christian's presentation to Judge Smith on February 3rd was imperfect, the undersigned finds credible Agent Bridges' testimony that he gave Judge Smith's February 3rd extension order, and the rest of the wiretap extension documents, to a clerk in the Clerk's Office for filing. In the first place, it is undisputed that the application and affidavit were given to the Clerk's Office as those documents are in the Clerk's file, and it makes little sense that Bridges would not have also presented the Order and his Attachment 1 to his affidavit. Moreover, Bridges knows that he asked for and received a copy of those documents (Tr. 262-63), which is consistent with his testimony that he sent a copy of the order to HIDTA (Tr. 44). In addition, given

---

[17] Although Quick testified that his office timestamps "everything that comes in" (Tr. 308), it did not timestamp the extension and affidavit that are in the Clerk's Office file. Thus, the evidence does not show that the lack of a timestamp means that a document has not been "properly filed."

that the Clerk's file containing the wiretap documents was made open to the public, there is the possibility that the documents that Bridges testified providing to the Clerk's Office have thereafter gone missing from the file.  Nevertheless, for purposes of analysis, the undersigned will assume that the Clerk's Office did not file Judge Smith's extension order, regardless of the cause of that failure.

In support of their contention that "there was not a lawful order" authorizing the wiretap extension for TT-1, Defendants rely on Georgia statutory and case authority that judgments and/or orders are not effective until filed, and they cite to testimony of Judge Smith given in a separate hearing that he thought that "there are cases that say than any order that's not reduced to writing and filed with the clerk is a nullity.  It's ineffective for any purpose."[18]  (*See, e.g.*, Doc. 271 at 12; *see also* Doc. 279-2 at 32-33).  Even if Judge Smith's extension order is invalid under Georgia law because it was not filed, Defendant has not shown that evidence obtained pursuant to that order should be suppressed in this *federal* criminal prosecution.  While it is true that the court must look to both federal and state law to determine the *validity* of a state-issued wiretap order, "the validity of the wiretaps is just the first inquiry."  *United States v. Govea-Vazquez*, 962 F. Supp. 2d

---

[18] Judge Smith also testified, "Or a judgment anyway . . . .  I don't know if there's a distinction between an order and a judgment, but I think that's correct."  (Doc. 279-2 at 22).

1325, 1328 (N.D. Ga. Aug. 12, 2013), *aff'd* 588 Fed. Appx. 935 (11th Cir. 2014). The "inquiry pivotal to this case [is] whether the invalid wiretaps and evidence obtained thereunder are admissible in a federal criminal case." *Id.* Thus, "this Court . . . looks to[] federal law to determine the admissibility of the wiretap evidence at issue." *Id.* at 1329.

In *Govea-Vasquez*, the court adopted Magistrate Judge Linda T. Walker's report and recommendation in *United States v. Soto-Pineda*, No. 1:12-CR-327-TCB-LTW et al., 2013 U.S. Dist. LEXIS 114289 (N.D. Ga. July 11, 2013). Judge Walker found in that case that although the issuing judges did not have the authority to issue wiretap orders allowing interception outside the boundaries of their judicial circuits under Georgia law at that time, suppression of evidence obtained pursuant to the wiretap orders was not required under federal law. *Id.* at *14-25. Judge Walker observed that "Georgia law . . . does not supply the rule of decision in analyzing whether evidence obtained based on a[] state wiretap order which was applied outside the state judge's judicial circuit must be suppressed in federal court." *Id.* at *17. Instead, "federal law applies in making that determination." *Id.* at *18; *see also Malekzadeh*, 855 F.2d at 1496 ("Admission in federal court of evidence obtained by state officers is governed by federal law."). While 18 U.S.C. § 2518(10)(a) provides for suppression of evidence "on the

grounds that (i) the communication was unlawfully intercepted," the Supreme Court "in interpreting this language . . . has held that . . . 'not every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications unlawful.' " *Id.* at *20-21 (quoting *United States v. Donovan*, 429 U.S. 413, 433-34 (1977)). Instead, " 'suppression is required only for a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." ' " *Id.* at *21 (quoting *Donovan*, 429 U.S. at 433-34). "Where the requirement violated does not play a central, or even functional role in guarding against unwarranted use of wiretapping or electronic surveillance, suppression is not required." *Id.* (citing *Donovan*, 429 U.S. at 435-36; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986)). Judge Walker could not "conclude that the jurisdictional requirement at issue in this case would play a central or functional role in guarding against unwarranted use of wiretapping or electronic surveillance," and therefore found that the evidence should not be suppressed. *Id.* at *22, 25. The undersigned finds that analysis persuasive and instructive in resolving the issue of suppression in this case.

Defendants have cited no authority that under federal law, evidence must be suppressed where a state judge signed a wiretap authorization order but that order was not filed. Nor can the undersigned conclude that the failure to file the order "would play a central or functional role in guarding against unwarranted use of wiretapping or electronic surveillance." *Soto-Pineda*, 2013 U.S. Dist. LEXIS 114289, at *22. The undersigned finds the Second Circuit's discussion in *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355 (2d Cir. 2003) helpful in evaluating the centrality of the "filing" requirement (to the extent that § 2518 has such a requirement). In that case, the court rejected the defendants' argument "that no order is effective until it is entered in the docket." *Id.* at 364-65. The court observed that in *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898 (2d Cir. 1997), it had "rejected the idea that an undocketed order was a nullity despite a local rule stating that 'notation in the appropriate docket . . . shall constitute the entry of the order,' " and explained that "the requirement that orders be entered in the docket is no more than 'a ministerial rule of procedure, intended to ensure that case dockets are properly maintained as useful sources of information for the litigants and court personnel.' " *Id.* at 365 (quoting *Lightfoot*, 110 F.3d at 909-10). The court in *Silivanch* noted that "other courts have treated the significance of docket entries similarly." *Id.* at 365 n.5 (collecting cases). Here, because the purported filing

"requirement violated does not play a central, or even functional role in guarding against unwarranted use of wiretapping or electronic surveillance, suppression is not required." *Soto-Pineda*, 2013 U.S. Dist. LEXIS 114289, at *21.

In the absence of authority under federal law that suppression is required where the issuing judge's wiretap authorization order is signed but not filed, the undersigned **RECOMMENDS** that Defendants' motion to suppress evidence obtained pursuant to the wiretap extension order for TT-1 based on the lack of filing of that order be **DENIED**.

## B.  Probable Cause And Necessity

Defendants assert that the application and affidavit seeking the extension of the TT-1 wiretap were never filed, as evidenced by the lack of timestamp indicating filing (*see* Docs. 277-6, 277-7), and therefore "the purported order [authorizing the extension] was signed without the government complying with the probable cause and necessity showing required by statute."  (Doc. 271 at 11). Thus, Defendants contend "any resulting order would be ineffective."  (*Id.*; *see also id.* at 13-14).  The undersigned disagrees because the undisputed evidence is that Agent Bridges and DA Christian presented those documents to Judge Smith, he reviewed them, and he signed the order, thus indicating that he found probable cause and necessity.  (*See* Doc. 277-6 at 18; Doc. 277-7 at 24).

60

Defendants further contend that the materials presented to Judge Smith did not establish necessity for the issuance of the extension order because the "Conventional Investigative Techniques" section simply references "Attachment #1 (*see* Doc. 277-7 ¶¶ 30-38), but the certified copy of the affidavit does not contain Attachment 1. (*See, e.g.*, Doc. 271 at 15). Therefore, according to Defendants, "the affidavit fails completely to establish that other 'investigative procedures [that] have been tried' and the reasons that other measures would 'be unlikely to succeed,' 18 U.S.C. § 2518(1)(c)." (*Id.*).

Agent Bridges' affidavit in support of the extension for TT-1 indicates that Attachment 1 was his affidavit that he submitted in support of the initial wiretap for TT-1, that Judge Smith had reviewed that affidavit, and that Attachment 1 would provide the information concerning "Conventional Investigative Techniques," i.e., necessity. (*See* Doc. 277-7 ¶¶ 21, 30-38). Agent Bridges also testified that Attachment 1 was a copy of the affidavit he presented in support of the application for the initial wiretap for TT-1, and that he presented that attachment to Judge Smith, along with the application, affidavit, and order for the wiretap extension order for TT-1. The undersigned finds Bridges credible as to his testimony that he presented Attachment 1 to Judge Smith and that Judge Smith knew that Attachment 1 was his previous affidavit for TT-1, which Judge Smith

had already reviewed and found supportive of necessity for the wiretap of TT-1. The undersigned acknowledges that Bridges initially testified that he told Judge Smith that Attachment 1 was the order, application, and affidavit submitted in support of the initial wiretap for TT-1 (*see* Tr. 39-43, 120-21), and he then corrected that testimony the next day (*see* Tr. 243). Nevertheless, the undersigned finds credible that Judge Smith reviewed the documents Bridges and Christian presented him in support of the extension application, including Bridges' affidavit, which Judge Smith signed. Not only does that affidavit reference Attachment 1, it states that the affidavit Judge Smith previously reviewed in granting the TT-1 wiretap "will be listed as Attachment #1 at the end of this affidavit." (Doc. 277-7 ¶ 21). Judge Smith testified at a state court hearing concerning his wiretap orders that he reads affidavits, applications, and orders before he signs them (*see* Doc. 279-2 at 7-8), so if Attachment 1 had not been presented to him as part of Bridges' affidavit referencing the attachment, Judge Smith surely would have inquired about its absence.[19] Thus, the undersigned finds Bridges' testimony that he presented Attachment 1 to Judge Smith to be credible.

---

[19] Moreover, on reading the affidavit Judge Smith would have seen that Attachment 1 was the affidavit he had already reviewed in support of the initial wiretap for TT-1, which he already found sufficient to show necessity.

Furthermore, the affidavit in support of the wiretap extension, including Attachment 1, support Judge Smith's probable cause and necessity findings to extend the wiretap of TT-1, for the same reasons discussed above in finding that the affidavit in support of the initial application for that line showed probable cause and necessity.   Moreover, the affidavit contains "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results," as required by 18 U.S.C. § 2518(8)(1)(f). Specifically, Bridges included information about calls intercepted pursuant to the initial authorization which demonstrate that Mayfield and others were discussing the sale of methamphetamine and cocaine.  (*See* Doc. 277-7 ¶¶ 22-27).

Accordingly, it is **RECOMMENDED** that Defendants' motion to suppress evidence based on a lack of probable cause or necessity for the wiretap extension for TT-1 be **DENIED**.

## V.   Lack Of Minimization

Defendants contend that "[t]he government has not shown that the authorization to intercept was executed in such a way as to minimize the interception of communications not otherwise subject to interception."  (*See* Doc. 109 at 13; Doc. 113 at 13; Doc. 162 at 14; *see also* Doc. 134 at 6-7; Doc. 135 at 6-7).  Under 18 U.S.C. § 2518(5), "[e]very order and extension thereto shall . . . be

conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ."  "Section 2518(5) does not forbid the interception of all nonrelevant conversations, but rather instructs law enforcement to conduct the surveillance in such a manner as to minimize the interception of such conversations."  *Maldonado*, 2013 U.S. Dist. LEXIS 182720, at *62 (citing *Scott v. United States*, 436 U.S. 128, 140 (1978)).  "When reviewing a challenge to the government's minimization efforts, courts are required to make an objective assessment of the monitoring agents' actions in light of the facts and circumstances confronting them at the time."  *Id.* at *62-63 (citing *United States v. Gonzalez Perez*, 283 Fed. App. 716, 722 (11th Cir. 2008)).

In support of their contentions as to the Government's lack of minimization efforts, Defendants assert:

> Here, the government's applications and extensions generalize the number of phone calls it listened to, and still did not have enough evidence to prove the targeted phone numbers actually had drugs at their physical address.  Furthermore, the government has not shown that abstracts or summaries of each conversation were made at the time of interception and were included in daily logs.  Neither the courts nor the legislature intended that listening to each and every call would be effective and reasonable minimization.  The government cannot identify a single minimization effort, because none took place.  If the government fails to minimize as required by Title III, strict adherence requires that the unlawfully obtained evidence must be suppressed.

64

(*See* Doc. 134 at 6-7; Doc. 135 at 6-7).  The Government counters that Defendants have not adequately supported their motion to suppress based on lack of minimization because they "fail to point to a single intercepted communication that should have been minimized but was not, and thus, their challenge cannot be sustained."  (Doc. 265 at 29).  The undersigned agrees.  "A general allegation that the government did not comply with statutory minimization requirements is inadequate." *Maldonado*, 2013 U.S. Dist. LEXIS 182720, at *63.  Instead, "the defendant must identify particular conversations so that the government can explain the reason why the conversation was not minimized."  *Id.*  (collecting cases); *see also United States v. Batiste*, No. 06-20373-CR-LENARD-TORRES, 2007 U.S. Dist. LEXIS 61186, at *48-49 (S.D. Fla. Aug. 21, 2007) ("Defendants have failed to identify any specific conversation or patterns of conversation which they maintain should not have been intercepted.  The general allegation that the government did not comply with the statutory minimization requirement is inadequate." (citing *United States v. Carter*, 449 F.3d 1287, 1295 (D.C. Cir. 2006)).

Moreover, the undersigned notes that the affidavits in support of the applications for wiretap authorizations set forth the minimization procedures to be followed, including briefing personnel concerning the minimization requirements

under 18 U.S.C. § 2510 *et seq.*, suspending interception immediately when it is determined "that the Target subject(s) or any other associates are not participants in the conversation," monitoring all wire communications to determine if a party to a conversation is a conspirator and discontinuing that monitoring "if, which making this identification, they determine that the conversation does not involve the Target Subject(s) or is not criminal in nature."  (*See, e.g.*, Doc. 277-2 at 31). *See, e.g.*, *United States v. Najera-Perez*, No. 1:12-CR-232-CAP-LTW, 2013 U.S. Dist. LEXIS 185792, at *49-50 (N.D. Ga. Nov. 15, 2013) (finding that the agents' affidavits "show that procedures were put in place to minimize the interception of irrelevant calls to and from the Target telephones," including suspending interceptions "when it is determined that the target subjects are not participants in the conversation," monitoring of all wire communication to determine if party to conversation is member of the drug trafficking organization but discontinuing monitoring "if agents determine that the conversation does not involve the target subjects or is not criminal in nature," and giving special attention "to minimize any privileged conversations"), *adopted by* 2014 U.S. Dist. LEXIS 28605 (N.D. Ga. Mar. 5, 2014).

The undersigned therefore **RECOMMENDS** that Defendants' motions to suppress based on lack of minimization be **DENIED**.[20]   *See, e.g.*, *Najera-Perez*, 2013 U.S. Dist. LEXIS 185792, at *50-51 ("Defendant presents no specific argument as to how under the facts and circumstances of this case, Government agents failed to minimize interception of irrelevant calls . . . .  Without some showing on Defendant's part, this Court cannot conclude that the Government did not minimize its interception of non-pertinent calls or that a hearing should be held to require the Government to prove that it properly minimized interception of irrelevant calls."); *Maldonado*, 2013 U.S. Dist. LEXIS 182720, at *63, 65

---

[20] Even if Defendants had identified a violation of the minimization requirements, it is not clear that suppression of all intercepted communications would be appropriate.  *See, e.g.*, *United States v. Chisolm*, No. CR413-007, 2013 U.S. Dist. LEXIS 184439, at *22 n.10 (S.D. Ga. June 13, 2013) (observing that "[a]bsent a *flagrant* violation of the minimization requirements, total suppression of all monitored calls is highly unlikely and, quite probably, inappropriate" and citing *United States v. Ozar*, 50 F.3d 1440, 1448 (8th Cir. 1995) ("Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations.  The non-incriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518(10)(a), but the conversations the warrant contemplated overhearing would be admitted.")), *adopted by* 2014 U.S. Dist. LEXIS 10416 (S.D. Ga. Jan. 28, 2014); *see also United States v. Batiste*, No. 06-20373-CR-LENARD-TORRES, 2007 U.S. Dist. LEXIS 61186, at *47 (S.D. Fla. Aug. 21, 2007) ("Errors in minimizing one particular interception within the context of a lengthy and complex investigation do not automatically warrant the suppression of all the evidence obtained through electronic surveillance.  Total suppression would not follow unless a defendant demonstrates that the entire surveillance was tainted." (citing *United States v. Baltas*, 236 F.3d 27, 32 (1st Cir. 2001)).

("Defendant's challenge to the Government's minimization efforts fails because Defendant did not present any specific information tending to show that the Government failed to minimize interception of irrelevant calls," and "[w]ithout some showing on Defendant's part, this Court cannot conclude that the Government did not minimize its interception of non-pertinent calls or that a hearing should be held to require the Government to prove that it properly minimized interception of irrelevant calls.")

## VI.    <u>Improper Copying And Dissemination</u>

Defendants point out that the wiretap authorization orders at issue provide that "working copies of all intercepted communications as well as sets of duplicate original recordings may be made before sealing of original recordings and their submission with the return and report to the Court.  These copies and original recordings shall be maintained by Special Agent Clay Bridges of the Georgia Bureau of Investigation and the District Attorney for the Mountain Judicial Circuit."  (Doc. 109 at 14; Doc. 113 at 13-14; *see, e.g.*, Doc. 277-3 at 11).  But Defendants contend that "copies were made and disseminated in violation of these orders and were made available to other people and law enforcement agencies not authorized in said orders."  (Doc. 109 at 14; Doc. 113 at 14; Doc. 162 at 14).  Defendants also assert that "[t]he government also failed to abide by § 2518(8)(a)

sealing requirements when they provided the evidence to a third party, to make copies of the disks, instead of to defense counsel.  The right of privacy is at the heart of Title III's protections.  The government violated this right to privacy when they gave all the private phone calls to a third party for duplication."  (Doc. 134 at 8; *see also* Doc. 135 at 8).  Defendants did not support those assertions, and the undersigned finds that their conclusory allegations are insufficient to demonstrate they are entitled to suppression on this basis.  Accordingly, it is **RECOMMENDED** that Defendants' motion to suppress based on improper copying and dissemination of the recordings be **DENIED**.

## VII.   <u>Out-Of-State Interception</u>

The Government points out that "[a]t least one Defendant argues that the wiretaps should be suppressed because the issuing judge exceeded the scope of his authority by authorizing out-of-state interception."  (Doc. 265 at 30; *see also* Doc. 215 at 6-7).  In response to the Government's motion to limit the scope of the evidentiary hearing (*see* Doc. 211), Defendant Steeple argued that an evidentiary hearing was required on several issues, including "whether the state wiretap authorization orders illegally authorized law enforcement to intercept outside the state."  (Doc. 215 at 6).  Judge Smith's authorization orders provided in relevant part, "It is further ordered that, based upon the fact Horace D. Mayfield III is likely

to travel out of Georgia during the course of this investigation, the State is authorized to continue to monitor and electronically intercept transmissions to and from the target telephone during any out of state travels." (*See, e.g.*, Doc. 277-3 at 9). Defendant contends that those orders violate O.C.G.A. § 16-11-64(c), which provides that orders authorizing wiretap surveillance "shall have state-wide application and interception of communications shall be permitted in any location in this state." (Doc. 215 at 6-7). Defendant also asserts that "upon information and belief [he] believes that most communications were intercepted in South Carolina and not in Georgia." (*Id.* at 7). Because those assertions were contained in a brief concerning the proper scope of the evidentiary hearing and not set out as a separate motion or asserted as a basis for suppression in Defendants' motions to suppress, it is not clear that Defendants have properly sought suppression on that basis. Nevertheless, the undersigned addresses this issue in an abundance of caution.

Title III defines "intercept" as "the aural or other acquisition of the contents of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). "Thus, under the current version of Title III, 'interceptions' of phone calls are deemed to occur not only at the listening post where the communications are overheard ('aural

acquisition'), but also at the situs of the tapped phone from which the contents of the communications are being redirected ('other acquisition')." *Luangkhot v. State*, 292 Ga. 423, 736 S.E.2d 397, 400 (Ga. 2013).[21]   Because the interceptions at issue occurred at the HIDTA server in Atlanta, Georgia, i.e., "at the listening post where the communications [were] overheard," the interceptions occurred within the state of Georgia.   *See, e.g.*, *United States v. Pierre*, 435 Fed. Appx. 905, 907-08 (11th Cir. 2011) (unpublished decision) (rejecting the defendant's contention that the issuing judge exceeded his jurisdiction because the defendant and his phone resided outside the issuing judge's jurisdiction where the listening post was located within the county of the judge's jurisdiction and a Florida appellate court had "held that 'the interception of a cellular call occurs both at the location of the tapped telephone and at the site where law enforcement authorities hear and record the call' " (quoting *State v. McCormick*, 719 So. 2d 1220, 1222 (Fla. 5th DCA 1998)).

---

[21]   In *Luangkhot*, the Georgia Supreme Court found that the issuing judge, a Gwinnett County Superior Judge, exceeded his territorial jurisdiction under the version of O.C.G.A. § 16-11-64 then in effect by authorizing interception of phone conversations for phones that were not located in Gwinnett County, and where the listening post, i.e., HIDTA, was located in Fulton County.  736 S.E. 2d at 427-28.  "Following the Supreme Court's decision in *Luangkhot*, the General Assembly amended the wiretap statue, O.C.G.A. § 16-11-64, to give superior courts the authority to issue warrants that have state-wide application and permit the interception of phone calls from any location in the state." *Estrada-Nava v. State*, 332 Ga. App. 133, 771 S.E. 28, 31 n.1 (Ga. Ct. App. 2015).

Accordingly, to the extent that Defendants move to suppress on the ground that the issuing judge authorized out-of-state interception or that out-of-state interception occurred, it is **RECOMMENDED** that motion be **DENIED**.

## VIII.  **Failure To Judicially Seal Recordings**

Defendants argue that the original recordings at issue have never been sealed as required by 18 U.S.C. § 2518(8)(a) because there is no order sealing the recordings, and the evidence bag containing the recordings and the returns were not timestamped by the Clerk of Court, thus indicating that they have not been filed with the Clerk.  (*See* Doc. 109 at 10; 113 at 10; Doc. 162 at 10-11; Doc. 270 at 22-28).  18 U.S.C. § 2518 requires that "[i]mmediately upon the expiration of the period of the order [authorizing the wiretap], or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.  Custody of the recordings shall be wherever the judge orders."  As discussed below, Agent Bridges did not present the recordings to Judge Smith "immediately upon the expiration of the period of" his authorization orders, or extensions thereof.  Agent Bridges and DA Christian *did*, however, made the original recordings "available to the judge issuing such order," and the recordings were sealed "under his direction."  That is, the evidence bag containing the discs was presented to Judge Smith and sealed, and Judge Smith initialed it and told

Bridges to take the discs to the Clerk's Office. (Tr. 84-86, 93, 149, 151; Docs. 278-8, 278-9). The Clerk has since maintained the recordings in his desk in the sealed bag. (Tr. 343-44). The statute simply requires that "[c]ustody of the recordings shall be wherever the judge orders," it does not require any particular procedure such as having the Clerk timestamp the bag or maintain it in a particular file, etc. Furthermore, the statute does not require that the issuing judge issue a separate sealing order as Defendants contend. It simply states that the recordings shall be "sealed under his directions," § 2518(8)(a), and they were. Moreover, each of Judge Smith's authorization orders directed that all wiretap-related documents, court reporter's notes, etc., and "all other matters filed or received herein shall remained sealed until further Order of this Court," and the caption of each of those orders, as well as all other wiretap applications, affidavits, and orders indicate "**UNDER SEAL**" in the caption. The undersigned rejects Defendants contention that the recordings have never been sealed under 18 U.S.C. § 2518(8)(a), and therefore, it is **RECOMMENDED** that Defendants' motion to suppress on that basis be **DENIED**.

## IX.   **Delay In Sealing**

Defendants also contend that wiretapped communications must be suppressed pursuant to 18 U.S.C. § 2518(8)(a) because the original recordings

were not sealed immediately upon the expiration of the wiretap authorization orders.  (*See, e.g.*, Doc. 109 at 6-11; Doc. 113 at 6-11; Doc. 134 at 7; Doc. 135 at 7-8; Doc. 143 at 1-2; Doc. 162 at 6-11; Doc. 270 at 28-36).

"Section 2518(8)(a) requires that '[the] contents any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device' and that recording 'shall be done is such way as will protect the recording from editing or other alterations.' " *Ojeda Rios*, 495 U.S. at 259.  "The section further provides that '[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.' " *Id.* at 259-60.  "Section 2518(8)(a) has an explicit exclusionary remedy for noncompliance with the sealing requirement, providing that '[t]he presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517.' " *Id.* at 260.  In *Ojeda Rios*, the Supreme Court explained that "[t]he 'absence' the Government must satisfactorily explain encompasses not only the total absence of a seal but also the absence of a timely applied seal."  495 U.S. at 263.  "The primary thrust of

74

§ 2518(8)(a) . . . and a congressional purpose embodied in Title III in general . . . is to ensure the reliability and integrity of evidence obtained by means of electronic surveillance." *Id.* "The presence or absence of a seal does not in itself establish the integrity of electronic surveillance tapes. Rather, the seal is a means of ensuring that subsequent to its placement on a tape, the Government has no opportunity to tamper with, or edit the conversations that have been recorded." *Id.* It is therefore clear "that Congress viewed the sealing requirement as important precisely because it limits the Government's opportunity to alter the recordings." *Id.*

As to the Government's burden to satisfactorily explain a delay in sealing wiretap recordings, the Court in *Ojeda Rios* rejected the Government's contention that it meets that burden if it "explains why the delay occurred and then demonstrates that the tapes are authentic." *Id.* at 264. The Court explained:

> The statute requires a *satisfactory* explanation, not just an explanation. It is difficult to imagine a situation in which the Government could not explain why it delayed in seeking to have tapes sealed. Even deliberate delay would be enough, so long as the Government could establish the integrity of the tapes; yet deliberate delay could hardly be called a satisfactory explanation. To hold that proof of nontampering is a substitute for a satisfactory explanation is foreclosed by the plain words of the sealing provision.

*Id.* at 264-65 (emphasis added).[22]

In these cases, the orders authorizing the wiretap investigation provided that "[t]he interceptions of wire and electronic communications must terminate upon the attainment of the authorized objectives," or "when (30) days elapsed . . . whichever occurs first."  (*See, e.g.*, Doc. 277-3 at 10).  It is undisputed that monitoring for all of the phones at issue terminated on February 17, 2016, on which date Defendants Mayfield and Jones were arrested (Tr. 67-68), and therefore agents were required to then "immediately" make those recordings "available to the judge issuing such order and sealed under his directions" pursuant to 18 U.S.C. § 2518(8)(a).  In *United States v. Matthews*, 431 F.3d 1296 (11th Cir. 2005), the Eleventh Circuit held that "immediately upon the expiration of the period of the order" for purposes of § 2518(8)(a) means "within one or two days."  *Id.* at 1307. Accordingly, because the recordings were not presented to Judge Smith for sealing until February 26, 2016, nine days after the wiretap investigation terminated on

---

[22] Similar to the Government's argument in *Ojeda Rios*, the law in this circuit prior to that decision "was that a delay in the sealing of wiretap recordings did not require suppression if the government 'accounted for the delay' and there was no showing of prejudice or that the integrity of the recordings was disturbed." *Jones v. United States*, 224 F.3d 1251, 1257 (11th Cir. 2000).  The Eleventh Circuit recognizes that "[t]he Supreme Court ha[s] rejected the Eleventh Circuit's requirement that a defendant had to show prejudice, or that the evidence had become compromised as a prerequisite to suppression," but instead, the Government must "come up with a satisfactory explanation" for a delay in sealing to avoid suppression.  *Id.* at 1258 (citing *Ojeda Rios*, 495 U.S. at 264-65).

February 17th, the recordings were not sealed "immediately upon the expiration of the period of the order, or extensions thereof" as required by 18 U.S.C. § 2518(8)(a).

The critical issue then is whether the Government has given a satisfactory explanation for the delay in sealing the recordings at issue.  In *Ojeda Rios*, the Supreme Court "conclude[d] that the 'satisfactory explanation' language in § 2518(8)(a) must be understood to require that the Government explain not only why a delay occurred but also why it is excusable."  495 U.S. at 265.  Although the Court did not elaborate on that standard, the Court addressed the Government's proffered explanation for its delay in that case—"that its delays were the result of a good-faith, objectively reasonable misunderstanding of the statutory term 'extension'—and concluded that "the Government is not required to prove that a particular understanding of the law is correct but rather only that its interpretation was objectively reasonable at the time." 495 U.S. at 265-66.  The Eleventh Circuit has not provided guidance or a standard to evaluate whether the Government's proffered reason for the delay is satisfactory under § 2518(8)(a).  Other circuits have articulated various standards or guidelines.

For example, in *United States v. Rodriguez*, 786 F.2d 472 (2d Cir. 1986), the court explained that "[w]hen the government has offered an explanation for the

delay, the factors considered in assessing the acceptability of the explanation have included the length of the delay[]; the amount of time needed to prepare the tapes for sealing[]; the diligence of law enforcement personnel in performing the necessary pre-presentment tasks[]; the foreseeability and urgency of circumstances diverting the attention and energies of those responsible for the presentation of the tapes to other matters[]; evidence of any tampering with the tapes of any other prejudice to the defendants[]; and any evidence of bad faith on the part of law enforcement agencies, such as any intent to evade statutory sealing requirements or to gain any tactical advantage[.]"   *Id.* at 477 (internal citations and quotations omitted).[23]   In *United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990), the court wrote, "In general, explanations have been ruled satisfactory where the government advanced a bona fide reason, there was no reason to believe there was any deliberate flouting of the Title III requirements, no reason to doubt the tapes' integrity, and no basis for inferring any other prejudice to the defendants."   *Id.* at 950.   In *United States v. Suarez*, 906 F.2d 977, 982 (4th Cir. 1990), the court explained that the Government must demonstrate good cause for the delay in

---

[23]   Although *Rodriguez* was decided before *Ojeda Rios*, the Second Circuit explained, consistent with the Supreme Court's discussion, that "the fact that there is no evidence that the tapes have been tampered with or that the delay caused the defendants any other prejudice does not relieve the government of its burden to present a satisfactory explanation."   786 F.2d at 477.

sealing and noted that "[a]mong the factors relevant in determining whether the government has presented a satisfactory explanation for its failure to seal are the length of any delay before sealing, the care taken in handling the recordings, prejudice to the defendants, any tactical advantage accruing to the government, and whether deliberate or gross dereliction of duty or honest mistake cause the failure to file." *Id.* at 982.[24]  In *United States v. Coney*, the Seventh Circuit grappled with the meaning of the phrase "satisfactory explanation" and articulated the following standard:

> The term "satisfactory explanation" is neither self-defining nor defined in the statute.  As a matter of semantics it could just mean believable or it could, as the defendant argues, mean that the explanation established that the delay had been justifiable.  In choosing between these possibilities we are guided by the statutory objective.  We ask what should be deemed "satisfactory" in the context of a statute aimed at preventing government tampering with electronic evidence. The answer is that an explanation is satisfactory if, in the circumstances, it dispels any reasonable suspicion of tampering.  The believability of the explanation is critical, and depends in part on its plausibility; the more plausible, the more believable.  The length of the delay is relevant as well, and also the nature of the crime, including its notoriety or the notoriety of the defendant, and thus the pressure on the government to obtain a conviction; and also the importance of the tapes to the government's case.

---

[24] In *United States v. Batiste*, No. 06-20373-CR-LENARD-TORRES, 2007 U.S. Dist. LEXIS 61186 (S.D. Fla. Aug. 21, 2007), a district court in this circuit cited the standards set forth in *Suarez* and *Maldonado-Rivera* in finding that the Government had offered a satisfactory explanation for the sealing delay in that case. *Id.* at *43-46.

407 F.3d 871, 875 (7th Cir. 2005).

Thus, these cases demonstrate that factors courts have considered in determining whether the Government's explanation for a sealing delay is satisfactory include the stated reason for the delay, the plausibility or believability of the reason, and whether the record shows that that is the actual reason for the delay; whether the reason is objectively reasonable; the length of the delay; and whether there is any evidence that the government delayed sealing to gain a tactical advantage over the defendant or to tamper with the recordings, i.e., whether the government acted in bad faith.

Here, the Government contends that Defendants' motion to suppress should be denied "[b]ecause there is a reasonable explanation for the delay in sealing the recordings, there is no evidence that the investigators delayed sealing the recordings to gain a tactical advantage over one or more defendants, and the evidence establishes that the records were securely maintained during the delay[.]" (Doc. 266 at 13-14).  Agent Bridges explained at the hearing that the recordings were not sealed until February 26, 2016 because he understood that a ten-day period between the expiration of the wiretap order and the sealing was permissible based on his review of previous wiretap authorization orders that had been issued, and Judge Smith's orders provided a 10-day period for the recordings to be

returned. (Tr. 62, 76-77, 112-15, 158).  He further testified that he believed that the agents were required to complete perfection of the synopses and transcripts and copying of the recordings for individual defendants before the original recordings were removed from the server at HIDTA based on what his supervisor and Mike Dull from HIDTA told him. (Tr. 68-70, 76, 91, 137-38).

Agent Bridges was certainly mistaken on the first point; the statute states that the recordings must be presented to the judge for sealing "immediately upon the expiration of the period of the order," 18 U.S.C. § 2518(8)(a), and the Eleventh Circuit has defined "immediately" for purposes of that statute as within one to two days, *Matthews*, 431 F.3d at 1307.  Bridges also appears to be mistaken on the second point as Mr. Dull testified that agents could continue working from a "working copy" of the recordings, even after the original recordings were removed, and he denied telling agents otherwise.  (Tr. 232, 234-35).  Nevertheless, upon consideration of the guiding principles and factors described by persuasive out-of-circuit authority, the undersigned finds that the Government has given a "satisfactory explanation" for the nine-day delay at issue.

As an initial matter, the undersigned finds that Agent Bridges' articulated reasons for the sealing delay are the actual reasons for the delay, i.e., he believed and relied on the reasons he testified to at the hearing.  The evidence shows that he

81

based his understanding on the sealing requirements on his review of a previous wiretap authorization order, which stated, "Let return hereof and report as required by law be made before me within forty (40) days of date hereof or ten (10) days from the date of the last interception, whichever is earlier." (Doc. 274-3).  That is the same language Bridges included in the draft orders that were ultimately signed, and he repeatedly testified that he believed he had 10 days to return the recordings because that is what Judge Smith's orders stated.

Defendants argue, however, that Bridges reviewed materials that indicated that he was required to return the recordings immediately, i.e., no later than one to two days after the termination of the wiretaps.  (*See* Doc. 270 at 23).  Bridges testified that Posey and Howard gave Bridges materials from a course, "a lot of documentation," that Bridges reviewed, though "[t]here may be something that [he] skimmed through."  (Tr. 103-05).  Those materials were not presented during the hearing, but Defendants obtained them from the Government and attached some of them to their post-hearing brief.  (*See* Docs. 270-1, 270-2).  One of those exhibits is a power point presentation about wiretaps.  (Doc. 270-2).  The 51st and 52nd slides in the power point presentation indicate that recordings "shall be made immediately available to the judge" and "In the 11th Circuit a 2 day delay qualifies as 'immediately.' " (Doc. 270-1 at 14).  Bridges did not testify that he saw those

slides, however, and he testified repeatedly and consistently that he believed he had 10 days to return the recordings for sealing which indicates that he did not see those slides and did not believe that he was required to return the recordings within two days. Moreover, the other agents' testimony supports Bridges' belief concerning the 10 days. Hodges testified that he understood the agents had 10 days to return the recordings to Judge Smith based on Judge Smith's orders and because he had seen other wiretap authorization orders and 10 days was "standard." (Tr. 196, 200, 205-06). Agent Thompson also believed the recordings had to be returned within 10 days based on Judge Smith's orders and his conversations with Agent Bridges. (Tr. 267).

Defendants also contend that "the go-bys that had been provided to S/A Bridges by supervisor concerning the sealing of the Blu-Ray discs does not provide support for the Government's current contentions," citing documents attached to its brief that do not reference a 10-day sealing period. (Doc. 270 at 6; Doc. 270-1). Those documents are copies of an affidavit, application, and order to seal intercepted calls in another wiretap investigation (Doc. 270-1), but those are not an affidavit, application, and order authorizing a wiretap investigation. Instead, the Government has provided a copy of an affidavit, application, and order authorizing a wiretap investigation in Douglas County in which the order contains the same

83

language about the 10 days Bridges included in his draft orders.  (*See* Docs. 274-1, 274-2, and 274-3).

As to Bridges' belief that the agents were required to complete the transcripts and copying of recordings before pulling the original recordings from HIDTA, Agents Hodges also testified that that was his understanding (Tr. 209-11, 213-14), and Agent Thompson testified that Agents Bridges and Hodges told him that they would not be able to perfect transcripts and work on the recordings after the original discs were removed from HIDTA (Tr. 267-68, 296-97, 300). Moreover, the record shows that the agents acted diligently pursuant to that apparently mistaken belief, even working over the weekend.

The undersigned also finds that Bridges' mistaken belief that the agents had ten days from the expiration of the wiretap authorization order to present the recordings to Judge Smith for sealing was objectively reasonable under the facts and circumstances.  In the first place, Agent Bridges, who was inexperienced in obtaining wiretap authorizations (Tr. 16), testified that he talked to his superiors and reviewed materials concerning wiretap authorization orders, including "go-bys" or previous wiretap authorization orders that had been signed by state court judges and which provided for a ten-day return period.  After he drafted the authorization orders, all of which included the language, "Let return hereof and

report as required by law be made before me within (40) days of date hereof or ten

(10) days from the date of the last interception, whichever is earlier"[25], the District

Attorney reviewed those orders and did not indicate to Agent Bridges that the time

frame for sealing the recordings was incorrect.  Furthermore, those orders were

presented to Judge Smith, who reviewed them and even required Bridges to make a

correction with respect to the wiretap authorization order for TT-1 (*see* Tr. 25-27),

but Judge Smith did not indicate that the sealing time frame was incorrect or

should be altered.  The fact that Judge Smith made a correction to the first draft of

the wiretap authorization order for TT-1 would have reasonably indicated that

Agent Bridges that if the orders were wrong with respect to the timeline for

presenting the recordings, Judge Smith would have told him they needed to be

corrected.  In light of Agent Bridges' review of a previous wiretap authorization

order that included a ten-day period to return the recordings, DA Christian's

review of Bridges' drafts of orders setting forth that same period, and Judge

Smith's approval of those orders, the undersigned finds Bridges' mistaken belief

that the agents had ten days to present the recordings to Judge Smith for sealing to

---

[25] The order extending the TT-1 wiretap was signed on February 3, 2016 (Doc.
277-8 at 12), the order authorizing the wiretap of TT-2 was signed on January 21,
2016 (Doc. 277-11), and the orders authorizing the wiretaps of TT-3 and TT-4
were signed on January 26, 2016 (Doc. 277-14 at 12, Doc. 278-2 at 12), so 10 days
after the termination of the wiretap investigation on February 17, 2016 was earlier
than 40 days from the dates on which the authorization orders were signed.

be objectively reasonable. *See, e.g.*, *United States v. Banks*, No. 13-cr-40060-DDC, 2014 U.S. Dist. LEXIS 120776, at *11 (D. Kan. Aug. 29, 2014) (finding government's explanation for delay satisfactory where judge was mistaken in his understanding of sealing requirements because "in light of the discrepancy in legal training between Judge Platt and Special Agent Virden, and in light of Judge Platt's status as a judge, . . . Special Agent Virden acted as a 'reasonably prudent' investigator when he relied on Judge Platt's instructions to continue recording on the same tape drives").

In addition, the undersigned notes that the delay at issue was not lengthy. Under the statute and relevant Eleventh Circuit authority, the recordings should have been presented to the judge for sealing no later than February 19, 2017, i.e., two days after the wiretap investigation concluded, but were not presented until February 26th, seven days later. Furthermore, no evidence has been presented that any of the agents involved acted in bad faith or in a way to obtain a tactical advantage over Defendants. The agents acted pursuant to orders reviewed by a District Attorney and approved by a Superior Court Judge indicating that they had 10 days to present the recordings for sealing. The agents acted diligently pursuant to their mistaken belief that they needed to complete the transcripts and individualized copies within that 10 day period; in fact Bridges presented them

before the expiration of that period.  *See, e.g.*, *United States v. Wilkinson*, 53 F.3d 757, 760 (6th Cir. 1995) (explaining that "[t]he 'good faith' nature of [the agent's and prosecuting attorney's] misunderstanding" that they had 15 days from the first interception to achieve the government's objectives and present the recordings for sealing was "further supported by the fact that the government sealed the briefcase tape on . . . the sixteenth day after the first interception").  Moreover, there is no evidence that the recordings were altered.  In fact, they remained secured on HIDTA's server in Atlanta until February 25, 2016, the day before they were presented to Judge Smith, and were secured in a locked vault in Bridges' vehicle February 25th to 26th.  The undersigned acknowledges that in *Ojeda Rios*, the Court indicated that "proof of nontampering" is not "a substitute for a satisfactory explanation" 495 U.S. at 265, but that language does not foreclose considering as one factor whether such tampering occurred in determining whether the Government's explanation is satisfactory, as courts have done since the decision in *Ojeda Rios*.  Even if the court ignores evidence of non-tampering, however, the undersigned still finds that the Government has provided a satisfactory explanation for the delay, particularly in light of Judge Smith's authorization orders that reasonably indicated to the agents that they had 10 days to return the recordings for sealing.

In the absence of Eleventh Circuit authority to assist in the resolution of Defendants' motion, the undersigned finds persuasive cases from other circuits that have found that the Government satisfactorily explained sealing delays in circumstances similar to those herein. In *Wilkinson*, the government should have submitted the recording at issue immediately after the objectives of the wiretap authorization order were achieved on January 7th, but instead the government sealed the tape on January 23rd, 16 days later. 53 F.3d at 760. The prosecuting attorney testified "that the government's interpretation of the authorization order was that it had fifteen days from the first interception in which to achieve its objectives," an interpretation that evidenced a "misunderstanding of the order." *Id.* The district court found that explanation to be satisfactory and denied the defendant's motion to suppress. *Id.* The Sixth Circuit held that the district court's "finding that the government provided a satisfactory explanation for the delay in having the tape sealed was not clearly erroneous" where the government acted consistent with its misunderstanding by sealing the tape on the sixteenth day after the first interception; "no basis exists for inferring any prejudice to Wilkinson"; "[t]here is no evidence of tampering"; and "there is no indication that the government's delay in sealing the tape was either a deliberate flouting of the statutory requirement or an effort to gain tactical advantage." *Id.*

In *Maldonado-Rivera*, the government explained delayed sealing of multiple recordings by relying on various erroneous interpretations of the law, including a Department of Justice attorney's "incorrect understanding" that "if the interceptions at various locations were interrelated, the statute required sealing only when there existed a hiatus in the electronic surveillance orders as a group," resulting in a 19-day delay in sealing; an FBI liaison agent's testimony that "while she was aware of the sealing requirement, she was not aware of the need for expedition in completing the task, and she thus waited for a call from the attorneys," resulting in a 16-day delay; and an AUSA's testimony that "it had been his belief that the sealing requirement was triggered by the end of the 30-day extension order and not by the earlier cessation of surveillance," and therefore he "simply did not rush to have the tapes sealed immediately after the surveillance cased on August 30," resulting in a 15-day delay in sealing. 922 F.2d at 951-52. The district court found that:

> each of these explanations, though founded on interpretations of the law that were erroneous, was credible. It found that there was no bad faith on the part of the agents or the supervising attorneys and that all government personnel involved had acted expeditiously within the framework of their understandings of what was required.

*Id.* at 952. The court therefore found that the government's explanations for the above-referenced delays were satisfactory and denied the defendants' motions to

suppress as to those recordings. *Id.* at 949. The Second Circuit explained that "[i]t is within the province of the district court to make determinations as to credibility," and the court "conclude[d] that [the district court's] findings as to the reasons for the delay and the lack of bad faith [were] not clearly erroneous" and saw "no basis for overturning the district court's . . . rulings that the government's explanations for the 15- to 19-day intervals were satisfactory[.]" *Id.* at 952, 953.

In *United States v. Sawyers*, 963 F.2d 157 (8th Cir. 1992), the government failed to timely seal wiretap recordings pursuant to three wiretap authorizations for the defendant's home and phone, resulting in a 32-day delay, a 12-day delay, and an 8-day delay; all of the recordings were filed on the same day, i.e., 8 days after the last wiretap authorization order expired. *Id.* at 159-60 and n.2. The County Attorney testified "that he did not seal the tapes immediately upon termination of the wiretap authorization because he believed the 'immediacy' requirement for sealing wiretap evidence to be analogous to the ten-day requirement for the return of physical evidence obtained through a search warrant." *Id.* at 160. He also testified "that he believed the subsequent wiretap authorizations were extensions of the original authorization since it was all part of one investigation and therefore, the authorization did not expire until eight days before the tapes were sealed." *Id.* The district court denied the defendants' motion to suppress the wiretap evidence

due to the delay in sealing, and the Eight Circuit affirmed, finding that "the county attorney's belief that each wiretap authorization constituted an extension of the original authorization was objectively reasonable at the time of the delay." *Id.* at 161.

In *Rodriguez*, the Second Circuit reversed the grant of a motion to suppress evidence of wiretap recordings where the government explained that the 14-day sealing delay was caused by the AUSA's belief (set forth in an affidavit) "that certain reports, somewhat time consuming to prepare, were required to accompany the tapes on their presentation for sealing." 786 F.2d at 478.  The court noted that "there was no such requirement," but the authorization order "did require [the AUSA] to submit progress reports every five days, and if her belief that the final report had to accompany the sealing presentation was genuine, that explanation should not, in this case, be dismissed." *Id*. at 478.  The court also noted evidence of the AUSA's work load and difficulty completing the report she believed to have been required in concluding, "we do not see that [the AUSA's] conduct as described in her affidavit bespoke any bad faith or lack of diligence," and found "no suggestion in the record that there was any opportunity for anyone to tamper with the tapes prior to their judicial sealing." *Id.*  Therefore the court was "unable to agree with the district court that the explanation offered by the government . . .

was insufficient as a matter of law to meet the requirement of § 2518(8)(a) of a 'satisfactory' explanation for the delay in the judicial sealing of the tapes." *Id.*

Defendants cite state cases in which the courts granted motions to suppress based on failures to seal the wiretap recordings, *King v. State*, 262 Ga. 147, 414 S.E. 2d 206, 207 (Ga. 1992), and *Porter v. State*, 209 Ga. App. 27, 432 S.E. 2d 629 (Ga. Ct. App. 1993) (*see* Doc. 270 at 29-32), but as discussed above, *federal* law determines whether evidence is admissible in a federal criminal prosecution. Moreover, the undersigned finds the cited cases distinguishable.  In *King*, after the wiretap concluded, the police placed the recordings in a cardboard box, taped up the box, and stored them in a locked filing cabinet with an alarm system.  414 S.E. 2d at 207.  A few days later they transported the tapes to the district attorney's office, and then the district attorney "filed a return of the warrant which indicated that the tapes were delivered to the custody of the court," but "the record does not show that the judge issuing the wiretap order, or any judge, ever directed that the tapes be sealed, nor does the record indicate that the state produced the 'presence of the seal' or make 'a satisfactory explanation for the absence thereof' as required by § 2518(8)(a)[.]"  *Id.*  The court concluded that "where the state has failed to show that the tapes were judicially sealed, the state's claim that there has been no tampering with the tapes will not prevent the exclusionary provisions of §

2518(8)(a) from coming into play." *Id.* Those facts are easily distinguishable from this case. Here, as discussed above, the recordings were sealed under Judge Smith's direction, but the sealing was delayed. Moreover, unlike in *King*, the Government has explained the delay, and the undersigned finds that explanation satisfactory.

In *Porter*, the wiretap interceptions concluded on March 7, 1991, but the recordings "were not delivered to the superior court judge for sealing until March 28, 1991." 432 S.E. 2d at 630. "The state offered no explanation for the delay in taking the tapes to the court, other than the testimony of Officer Zimmerman, the lead investigator, who testified that he was unaware that federal law required that the tapes be submitted immediately to the court for sealing." *Id.* The court found that the state had not offered a satisfactory explanation for the delay: "The state's sloppy compliance with the requirements set forth in 18 U.S.C. § 2518 is not excusably explained by an assertion that they were unaware of the requirements. Each department of the state which was involved with the present wiretapping operation; the police, the district attorney, and the judge is charged with knowledge of the law." *Id.* at 632. The undersigned again finds *Porter* distinguishable. There the only evidence of the state's "explanation" for the 21-day delay in sealing the recordings was the lead investigator's testimony that "he was unaware that federal

law required that the tapes be submitted immediately to the court for sealing." *Id.* at 630.  Here, Agent Bridges testified that he believed he had 10 days to present the recordings based on his review of a previous wiretap authorization order, as well as the fact that the DA and the issuing judge did not correct that belief; instead the judge signed the orders providing for the returns to be done no later than 10 days after the wiretap investigation terminated.

The court's discussion in *Porter* is well-taken: "It is the responsibility of the trial court to ensure that procedural safeguards, statutorily provided, are strictly complied with and it is the duty of the district attorney and the chief law enforcement officer of the county to ensure that their personnel are properly trained and that they follow the law."  *Id.* 632.   But the undersigned must determine whether under the facts and circumstances of *this case*, the Government has offered a satisfactory explanation for the delay in sealing, or whether the evidence obtained pursuant to the wiretap orders at issue should be suppressed. The undersigned finds that the sealing delay at issue resulted from Agent Bridges' good faith mistaken belief that the agents had ten days to present the recordings to Judge Smith.[26]  The Government has therefore satisfactorily explained the delay in

---

[26] The undersigned finds apt the admonition offered in *Rodriguez*:

sealing the recordings at issue and suppression of those recordings is not required due to the delay. *See, e.g.*, *United States v. Banks*, No. 13-cr-40060-DDC, 2014 U.S. Dist. LEXIS 165213, at *18-19 (D. Kan. Nov. 26, 2014) (finding government's explanation for delay was satisfactory because "Special Agent Virden acted reasonably and in good faith when he discussed how to maintain the recordings with Judge Platt; he did not disregard the sealing requirement intentionally; there was no risk of tampering with the recordings; and no defendant has sustained any prejudice from the delay"). Accordingly, it is **RECOMMENDED** that Defendants' motions to suppress based on the delay in sealing the wiretap recordings be **DENIED**.

### Summary

For the reasons discussed above, it is **RECOMMENDED** that Defendants' motions to suppress evidence of wiretap interceptions pursuant to Title III (Docs. 109, 113, 134, 135, 136, 143, 157, 162, 207, 208, 209, 210, 214, 227, 237, and 271

---

In law, as in life, today's satisfactory explanation may very well be tomorrow's lame excuse. As the federal and state case law in this area grows, the failure to foresee and, where possible, prevent sealing delays becomes less justiciable, as law enforcement officials must be expected to learn from their own experiences and those of others.

786 F.2d at 479 (quoting *United States v. Vasquez*, 605 F.2d 1269, 1280 (2d Cir. 1979)).

in 2:16-CR-9 and Docs. 78, 85, 110, 111, 119, 127, 140, 167, and 187 in 2:16-CR-

10) be **DENIED**.

    **IT IS SO REPORTED AND RECOMMENDED** this <u>28th</u> day of

<u>February</u>, 2017.

                                      <u>*/s/ J. CLAY FULLER*</u>
                                      J. CLAY FULLER
                                      United States Magistrate Judge